**IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE**

**AT KNOXVILLE**

**JULY SESSION, 1997**

FILED

January 8, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 03C01-9608-CR-00308** |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | **SULLIVAN COUNTY** |
| **VS.** | ) | |
| | ) | **HON. FRANK L. SLAUGHTER** |
| **ROBERT BACON,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | (Rape) |

ON APPEAL FROM THE JUDGMENT OF THE
CRIMINAL COURT OF SULLIVAN COUNTY

FOR THE APPELLANT:

JAMES A. NIDIFFER
201 W. Watauga Avenue
P.O. Box 118
Johnson City, TN 37605

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

TIMOTHY F. BEHAN
Assistant Attorney General
425 5th Avenue North
Nashville, TN 37243

GREELEY WELLS
District Attorney General

TERESA MURRAY-SMITH
Assistant District Attorney General
Blountville, TN 37617

OPINION FILED _____

CONVICTION AFFIRMED; REMANDED FOR
FURTHER SENTENCING PROCEEDINGS

DAVID H. WELLES, JUDGE

# OPINION

This is an appeal as of right pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure. The Defendant, Robert Bacon, was convicted by a Sullivan County jury of rape.[1] He was sentenced as a Range I, standard offender to eight years and fined twenty-five hundred dollars ($2500.00). He was ordered to serve his sentence in community corrections. The Defendant now appeals his conviction raising ten issues for review:

> (1) That the evidence is insufficient to support a verdict of guilt;
> (2) that the verdict is against the weight of the evidence and the trial court erred by failing to grant a new trial;
> (3) that the State failed to disclose exculpatory evidence prior to the trial;
> (4) that the trial court erred by admitting hearsay evidence under the excited utterance exception;
> (5) that the trial court erred by failing to suppress tape-recorded telephone conversations between the victim and the Defendant;
> (6) that the trial court erred by failing to submit to the jury transcripts of the tape-recorded telephone conversations;
> (7) that the indictment was fatally defective because it did not allege the requisite mens rea for rape;
> (8) that the court failed to timely rule upon the Defendant's motions, denying him a full and fair trial;
> (9) that the trial court erred by failing to grant the Defendant's motions for a mistrial;
> (10) that the trial court erred by allowing the jury to submit questions for a witness.

The State appeals the trial court's placing the Defendant in community corrections. We affirm the Defendant's conviction for rape, but reverse and

---

[1] Tenn. Code Ann. § 39-13-503.

remand to the trial court for further proceedings to properly determine the manner of service of the sentence.

The State presented the following proof at trial. Lisa Harwood, the victim, testified that she was twenty-nine years old and married with three children. The youngest was three weeks old at the time of trial. She testified that her husband, Mike Harwood, and the Defendant had been friends since childhood. She met the Defendant once when she was fifteen or sixteen and he visited her home briefly on two occasions prior to the incidents in question. The Defendant and Mr. Harwood worked at the same company as truck drivers. In the past, both of the Harwoods had invited the Defendant and his wife over for dinner, but this never occurred.

Mrs. Harwood testified that on March 28th, 1995, a Tuesday, between 8:00 and 9:00 a.m., she called the Defendant to invite him and his wife over for dinner that next weekend. She did not recall whether she and the Defendant discussed the fact that Mr. Harwood was gone on a work trip. After the phone conversation, she took a shower and dressed her children. Approximately forty-five minutes after she hung up the phone, or between 10:15 and 11:00 a.m., the Defendant showed up at her home unannounced. Mrs. Harwood was in the bathroom brushing her teeth and her five-year-old tried to open the door. Mrs. Harwood then went to the door to unlock it. When she saw the Defendant she was not surprised because he was a friend. The Defendant stated that he was getting a part for his motorcycle near her home, so he stopped by. Mrs. Harwood did not see a motorcycle, but did notice the Defendant's red truck parked in the driveway. The Defendant came in the trailer and the two talked in the kitchen while Mrs.

Harwood finished cleaning up. He discussed where Mr. Harwood was traveling and showed Mrs. Harwood a map. The Defendant talked about religion and apologized for his behavior on the previous Saturday night.

He had visited the Harwoods, also unannounced, on the previous Saturday, March 25, 1995. He arrived at approximately 6:30 to 7:00 p.m. The family was going to the store, but decided to stay at home after the Defendant arrived. The Defendant and Mr. Harwood went to the store while Mrs. Harwood stayed and bathed the children. The two men returned within an hour and the Defendant heated a frozen dinner in the microwave. Both were drinking beer and sitting in the kitchen. At some point, Mrs. Harwood sat with them and talked, but she continued to work around the house. She noticed that the men rented a pay-per-view movie on television and had moved into the living room to watch it. The movie appeared to be women modeling lingerie. The men left briefly to buy more beer. At approximately 11:00 p.m., Mr. Harwood decided to take a shower because he had just returned from a trip. Mrs. Harwood testified that she sat on a loveseat in the living room and the Defendant continued to sit in a chair and watch the movie. Mrs. Harwood got up and the Defendant grabbed her and asked her to touch him and she pulled away, saying that it was not going to happen.

Mrs. Harwood testified that she was upset and nervous and went into the kitchen. She went back through the living room to go outside, at which point the Defendant grabbed her again and exposed his penis. He kept asking her to touch his penis because he needed someone to help him out. He asked her to touch it either "one more time" or "one time." Mrs. Harwood told him to stop

because her husband would soon finish his shower. She testified that she did not call out to her husband because he had been drinking and she wanted to avoid a fight. The Defendant appeared to be intoxicated. They heard the bathroom door open and the Defendant pulled up his pants. The Defendant stated: "He'll never know. I'm good at this." Mr. Harwood returned to the living room and encouraged the Defendant to stay because he had been drinking. The Defendant declined and left after a few minutes.

Mrs. Harwood later told her husband what the Defendant had done. The next morning, a Sunday, the Defendant telephoned the Harwoods and apologized for his behavior. He blamed it on marital problems and that he prayed about it and the Lord had forgiven him. Mrs. Harwood testified that he seemed sincere and very believable.

On Tuesday, the 28th, after the Defendant showed up at the Harwood's residence, he and Mrs. Harwood talked. The Defendant was wearing sweatpants and a leather jacket. Mrs. Harwood was wearing a white tee shirt, black pants, and had a towel on her head because her hair was still wet. Mrs. Harwood's father came and picked up her five-year-old daughter to spend Tuesday night with them. Her two-year-old was still in the home, but fell asleep. Mrs. Harwood and the Defendant sat in the living room at approximately 12:00 to 12:30 p.m. to watch television. She testified that she sat in a chair next to the bar while the Defendant chose to stand near her.

Mrs. Harwood turned away to put down her drink and the Defendant got on the chair. He put his legs on the arms of the chair, grabbed her arms, and told

her he wanted her to "suck his dick." Mrs. Harwood said "no." The Defendant's crotch area was near her face. While holding her wrists, the Defendant then pulled down his sweatpants with his thumbs and exposed his penis. Mrs. Harwood testified that she pulled her wrists away and tried to hit him. The Defendant then grabbed her arms and pinned them to the chair arms with his knees on her elbows. The Defendant tried to force his penis in her mouth with his hands. Mrs. Harwood kept telling him no and the Defendant stated: "You know you want to do this. You know this is really what you want to do." He pulled her hair and pushed his penis in her mouth. Mrs. Harwood estimated that it was in her mouth for three minutes. Upon hearing a neighbor pull a car in the driveway, the Defendant stopped, pulled his pants up and stated: "This doesn't change anything. We can still be friends. I'll call you later." He then left. After the Defendant left, Mrs. Harwood went into the bathroom to throw up. She sat down, wondering what happened and feeling shocked that her husband's friend did such an act. She eventually called her neighbor, Wanda Lucas, at approximately 6:00 p.m. Ms. Lucas came to Mrs. Harwood's trailer, heard her story and told her to call the police.

After being interviewed by Detective Ty Boomershine of the Sullivan County Sheriff's Department, she agreed to tape-record telephone calls to the Defendant. Recordings of two calls were played for the jury at trial. Mrs. Harwood testified that she did not ask nor did she give permission to the Defendant to do any acts to her.

On cross-examination, Mrs. Harwood testified that she talked on the telephone with the Defendant on a number of occasions. He would ask about her

husband's work trips and would ask for information that might assist him with his upcoming trips. Mrs. Harwood admitted that on the Saturday evening when the Defendant was visiting, she drank two sips of her husband's beer and consumed one alcoholic beverage of some type. She admitted to stating in the preliminary hearing that she drank half a beer and a glass of wine. She denied assisting the men order the pay-per-view movie on television. Mrs. Harwood testified that Mr. Harwood and the Defendant went back to the bedroom, but she did not go back there. She stated that her husband told her later that he showed their sexual devices and gave a pair of men's red underwear to the Defendant. She admitted owning a pink rubber penis, but denied that it had a nickname of "Pinky." Mrs. Harwood testified that the Defendant began discussing his sexual frustrations with his wife and she suggested he talk to his pastor. She denied making any sexual comments to the Defendant.

Mrs. Harwood saw a pair of red underwear lying by the Defendant's coat. She testified that she watched approximately ten minutes of the lingerie movie while her husband was in the shower. After the Defendant first grabbed her, she went into the kitchen, then again went past him to get outside where she was going to wait for her husband to get out of the shower. She called the Defendant to invite him to dinner at Mr. Harwood's suggestion. Mrs. Harwood testified that she let the Defendant in the trailer on that Tuesday because he had apologized and it seemed sincere and she attributed his behavior to being intoxicated. She admitted that in the preliminary hearing, she had testified that the Defendant had been let in the house by her daughter. She also stated that after the Defendant grabbed her arms and pinned her in the chair, she attempted to kick him in the groin as well as hit him. She admitted that, as the Defendant was attempting to

force his penis in her mouth, she was moving her head from side to side and telling him to stop. The Defendant did not force her mouth open, but eventually forced his penis in her mouth as she was talking the whole time. The Defendant left her home sometime after 12:00 p.m. She did not call her neighbor until 4:00 or 5:00 p.m. and her neighbor came to her trailer at approximately 7:00 p.m. Mrs. Harwood did not recall whether the Defendant ejaculated in her mouth. She admitted that she did not tell the Defendant he was being tape-recorded when she made the telephone calls to him.

Mrs. Harwood's father testified that when he went to the trailer to pick up his granddaughter, he saw no one but his daughter and granddaughters. He arrived sometime in the middle of the morning. He testified that Mr. Harwood has a temper and gets mad.

The State also presented the testimony of Wanda Lucas, the Harwood's neighbor. Ms. Lucas testified that she lived within the group of four mobile homes where the Harwood's lived. Mrs. Harwood telephoned her to come over and she sounded upset. She estimated this was at approximately 3:00 p.m. When she arrived, Mrs. Harwood was crying, her eyes were red and she was really nervous and upset. Mrs. Harwood told her that the Defendant forced her to perform oral sex. Ms. Lucas had noticed a red truck at the Harwood's that day and on the previous Saturday. On cross-examination, Ms. Lucas stated that she saw the red truck there after Mrs. Harwood's father left. Mrs. Harwood described how the incident occurred and that she was pinned in a chair and that the Defendant forced her to perform oral sex. Ms. Lucas and her husband encouraged Mrs. Harwood to call the police.

Next, the State presented testimony from Mike Harwood, the victim's husband. The Defendant was a childhood friend and coworker of Mr. Harwood. Mike Harwood testified at trial that he helped the Defendant secure a truck driving job at his place of employment. The Defendant and Mr. Harwood traveled together for work on two occasions. They maintained a social relationship in which the Defendant mentioned that he was having some marital problems, but did not elaborate. Mr. Harwood testified that the Defendant "popped in" at his home at 6:30 or 7:00 p.m. on March 25th, the Saturday before the rape. Harwood and his family, who were leaving to go grocery shopping, decided to stay at home because they had company. Mr. Harwood and the Defendant then decided to get some groceries and a six-pack of beer and return home. The Defendant bought frozen dinners which he later heated in the Harwood's microwave. The Defendant telephoned his wife several times, but could not reach her.

Mr. Harwood testified that while the two men talked, Mrs. Harwood did housework and cared for the two children. Both men sat and talked in the living room, drank the beer, and decided to rent a pay-per-view movie on television which featured women modeling lingerie. There was no actual nudity nor were sex acts depicted in the film. The men continued to talk while the television was on. Mrs. Harwood was bathing and readying the children for bed. The Defendant told Mr. Harwood that he was having marital problems because his wife was sexually unresponsive. Mr. Harwood took the Defendant to bedroom to show him some sexual toys or devices. Mrs. Harwood was not present in the bedroom at this time. Mr. Harwood gave the Defendant a pair of men's red novelty briefs with "Home of the Whopper" emblazoned on the front. Mr.

Harwood was not aware if his wife knew anything about the men's conversation or his gift to the Defendant. The men returned to the living room at which point Mr. Harwood decided to take a shower because he had not cleaned up since returning from his trip. Mrs. Harwood was in the kitchen. After his shower, Mr. Harwood encouraged the Defendant to stay overnight rather than allowing him to drive because they both had been drinking. The Defendant declined and left shortly thereafter.

The Defendant called a few minutes later at Mr. Harwood's request when he reached his home because of Harwood's concern about his driving safely. Mr. Harwood testified that afterward, his wife said that the Defendant had pulled her toward him and asked her to touch him. Mr. Harwood was angry, but excused the Defendant's actions as alcohol-induced behavior. The Defendant called the next morning and Mr. Harwood mentioned the inappropriate behavior. The Defendant apologized. Mr. Harwood felt that the Defendant would be less welcome at his home and he did not suggest plans to see him again.

On cross-examination, Mr. Harwood testified that the Defendant came to his house on Saturday to show off the Defendant's new truck. The Defendant had met Mrs. Harwood one time and talked with her on the telephone. Mr. Harwood could not recall discussing sexual matters early during the visit on Saturday. They rented the movie on television sometime after 8:00 p.m., the children's bedtime. At some point the men decided to get a second six-pack of beer after drinking the first one. They drank three more, for a total of nine beers between them. Mrs. Harwood took some sips of beer at some point in the evening. He could not recall whether she also drank some wine or liquor. In

-10-

explaining why he took the Defendant back to the bedroom to show him the sexual novelties, Mr. Harwood testified: " I just got a wild hair. I thought about it and I said, well, I'll take him back there and show him that and maybe it will help him out." He showed the Defendant a rubber penis named "Pinky" and gave him the novelty men's underwear in the hope of improving his sex life. Mrs. Harwood was not in the bedroom during this exchange. After Mrs. Harwood told Mr. Harwood what the Defendant did to her, he chose not to telephone him immediately. Mr. Harwood stated that usually the Defendant would call their home and it would be unusual for his wife to call the Defendant. Mr. Harwood learned about the rape on Tuesday, March 28th after he called home from a trip to New Jersey. On redirect examination, Mr. Harwood admitted that he would request his wife to arrange social engagements over the telephone because he disliked talking on the phone.

Detective Ty Boomershine testified at trial that at approximately 7:30 p.m. on March 28, 1995, the Sullivan County Sheriff's Department responded to a report of rape called in by Lisa Harwood. He went to her home, located in a small trailer park in Kingsport. The detective noticed that both of the victim's forearms were red and that one arm was beginning to bruise. He could not recall which arm was bruised. As part of the investigation, he returned to Mrs. Harwood's home on March 30 to discuss making a tape recording of a telephone call with the Defendant. Detective Boomershine indicated that he needed a tape such that the average person could understand the content of the conversation. With Mrs. Harwood's consent, she taped one call on March 30, 1995. Detective Boomershine reviewed the tape and asked Mrs. Harwell to make a second call, which was recorded on April 4th. On one of the visits subsequent to March 28,

-11-

Mrs. Harwood pointed out the bruises on her right arm. On cross-examination, the detective noted that he arrived at the victim's home on March 28 between 7:40 and 7:45 p.m. He observed no signs of a struggle within the trailer. Detective Boomershine testified he requested the victim tape her call and that he needed a second tape because the victim referred to the rape as "it" on the first tape and that was too ambiguous. On cross-examination, the detective stated that he felt the case involved one person's word against another and that further proof in the form of the tape-recordings would be helpful. He made no suggestions regarding the content of the calls.

At the close of the State's proof, the Defendant moved for a judgment of acquittal, which was denied.

The Defendant testified in his defense. He testified that he had known Mike Harwood since childhood and that Harwood got him a job at his place of employment. The Defendant met the victim once when he was a teenager, and later once at the Harwood's home. He stated he developed a social relationship with the victim over the telephone and that they confided in each other and discussed sex. On March 25, 1995, he stopped by the Harwood's to show them his truck. He and Mr. Harwood bought some beer and the Defendant heated a frozen dinner. The two men and Mrs. Harwood sat at the kitchen table and talked. Mrs. Harwood began making sexual innuendoes towards the Defendant. Mrs. Harwood was urging her husband to go out by himself and get some other alcoholic drinks because she did not like beer. The Defendant felt that she was trying to get rid of her husband. Both men went to get some more beer.

-12-

The Defendant testified that the victim drank two beers and that they finished all the beer. The Defendant complained about his sex life and Mrs. Harwood said that wouldn't happen if she were his wife. The Defendant testified that he weighs two hundred pounds and that he drank five beers that night and was feeling "tipsy." He testified that Mrs. Harwood urged her husband to show the Defendant their sex toys. He saw a pink "dildo" that Mrs. Harwood referred to as "Pinky" and a few other items. They gave him the "Whopper" underwear. The Defendant was joking about the rubber penis while Mrs. Harwood stood in the doorway to the bedroom. Mr. Harwood decided to order a movie and Mrs. Harwood helped make the call. The movie had women in lingerie and some nudity and provocative dancing.

While watching the movie and when Mr. Harwood was in the shower, Mrs. Harwood said the movie was turning her on. She got up from a chair and the Defendant exposed himself and she made some comments to him. He encouraged her to touch him at which point Mr. Harwood said: "What's going on in there?" After Mr. Harwood took a shower, both of the Harwoods indicated that the movie was turning them on and the Defendant told them to go into the bedroom. The Defendant continued to drink and watch the movie. He testified that the Harwoods returned to the kitchen and Mrs. Harwood performed fellatio on her husband. The Defendant did not have a clear view of them, but knew it was happening because of their positions. Later they encouraged the Defendant to stay, but he refused because he did not feel drunk.

The Defendant testified that the Harwoods called on Sunday morning to apologize to him. They invited the Defendant and his wife for dinner sometime.

Mrs. Harwood then called on Tuesday, the 28th, which was unusual. She told him about a frozen dinner and the underwear he left. He testified that she said her husband would not care if they got caught doing something sexual together. After the Defendant arrived unannounced at the Harwood's trailer on Tuesday, Mrs. Harwood asked when her husband would be back from a trip. She closed the curtains and the blinds on the windows. Mrs. Harwood's father came and picked up his granddaughter. The Defendant testified that Mrs. Harwood sat down in a chair and "was looking at me in such ways like come over here." He stated that he went over to the chair and Mrs. Harwood took his penis in her hand then performed fellatio. At one point she hesitated and the Defendant placed her hand back on his penis. He testified that Mrs. Harwood never said "no" nor did she ask him to leave. A car pulled up and Mrs. Harwood stopped, got up to see who was there, then the two went to the couch and continued the oral sex. The Defendant testified that he ejaculated and afterwards, Mrs. Harwood stated "I'm going to want to do this more often." They talked for a short while, then the Defendant left.

Upon cross-examination, the Defendant admitted he was persistent about initiating a sexual encounter with the victim. He also admitted that, in a statement made to Detective Boomershine, he denied that anything happened on the Saturday when Mr. Harwood was in the shower. The Defendant stated that on the tape-recorded telephone conversations, he denied forcing the victim. However, when Mrs. Harwood replied: "But you did," the Defendant did not respond. He testified that when the victim said "no" she was still responding sexually and that he did not interpret that to mean "stop." The defense rested.

The State recalled Mike Harwood in rebuttal. He testified that he and his wife never engaged in sexual activity in the presence of the Defendant. He denied that he made any "wife swapping" suggestions.

The jury found the Defendant guilty of rape and set a fine of $2500. A sentencing hearing was held on May 10, 1996, and continued to June 28, 1996. The Defendant was sentenced to eight years and the $2500 fine was approved. The Defendant submitted a motion for new trial, which was also considered on June 28th, and denied. The Defendant asked for probation, and the trial court sentenced him to one year in Hay House, a community corrections treatment program. The trial court set a review of the Defendant's progress for August 30, 1996, at which time the trial judge approved the sentence set on June 28th.

The Defendant now appeals his conviction, raising numerous issues for review. The State has appealed the Defendant's sentence, arguing that the trial court erred by sentencing the Defendant to community corrections.

I.  Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to support a verdict of guilt for rape. When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual

issues raised by the evidence, are resolved by the trier of fact, not this court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Nor may this court reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. Cabbage, 571 S.W.2d at 835. Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Grace, 493 S.W.2d at 476.

The victim testified that the Defendant held her down on a chair and forced his penis into her mouth. She explained that he did not force her mouth open, but because she was talking to him while he attempted to achieve penetration, he managed to force his penis into her mouth. In order to obtain a conviction for rape, the State was required to prove that the Defendant recklessly, knowingly or intentionally sexually penetrated the victim accompanied by force or coercion. Tenn. Code Ann. §§ 39-13-503(a); 39-11-301(c). Sexual penetration is "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7).

The Defendant contends that the victim's account of the rape defies the "physical facts rule," and that her testimony should be disregarded and consequently, other witnesses' corroborative testimony alone cannot support his conviction.  See State v. Hornsby, 858 S.W.2d 892, 894 (Tenn. 1993); State v. Watkins, 754 S.W.2d 95, 99 (Tenn. Crim. App. 1988).  We disagree.  The physical facts rule is the principle that testimony that is entirely irreconcilable with the physical evidence may be disregarded.  Hornsby, 858 S.W.2d at 894.  This includes "events that could not have occurred under the laws of nature," however, the facts used must be based on universal physical laws and not where its application turns upon calculations of uncertain matters.  Id. at 894-95.  In criminal cases, the power to disregard testimony should be used sparingly and "[w]hen the testimony is capable of different interpretations, the matter should be left for the jury to decide as the sole arbiter of credibility."  Id. at 895.  We believe this is such a case.

The Defendant argues that the account of how the rape occurred was physically impossible.  He contends that he could not have pinned the victim in a chair and pulled his sweatpants down with his thumbs as the victim testified.  Furthermore, he claims that it was physically impossible for him to achieve penetration when the victim was thrashing her head about.  However, penetration includes forcing a penis into someone's mouth, however slight that penetration may be.  The victim testified that the Defendant pinned her arms with his legs, pulled her hair and used his hand to force his penis in her mouth.  She also testified that her mouth was open because she was speaking to the Defendant.  We can only conclude that a rational juror could have found that the Defendant was able to force his penis in the victim's mouth at some point during the

-17-

struggle. This provides sufficient proof that the Defendant penetrated the victim and nothing indicates that the act was clearly physically impossible to achieve. This issue is without merit.

## II. Weight of the Evidence

Next, the Defendant contends that the trial court erred by failing to grant his motion for a new trial. He argues that the weight of the evidence is contrary to the verdict and that the trial judge should have exercised his thirteenth juror power. The Defendant cites to numerous instances of inconsistent and contradictory testimony from the trial. He charges that the trial court was called upon to evaluate the credibility and weight of the testimony. He argues that this Court should be dubious of the conviction beyond a reasonable doubt and remand to the trial court to enter an order for a new trial.

The thirteenth juror rule is applicable to all criminal cases and is embodied in Rule 33(f) of the Tennessee Rules of Criminal Procedure. It states that "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." Tenn. R. Crim. P. 33(f). However, once the trial court approves the verdict as the thirteenth juror and imposes judgment, the review of the evidence on appeal is quite limited, requiring the accrediting of the testimony of the witnesses for the state and the resolution of evidentiary conflicts in favor of the state. State v. Moats, 906 S.W.2d 431, 435 (Tenn. 1995); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973); State v. Burlison, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993). The trial court need not make statements in the record of its approval of the verdict, rather, when it simply overrules a motion

for new trial without comment, this Court may presume that the trial court approved the verdict as the thirteenth juror. State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995). Only when the record contains statements indicating that the trial judge expressed dissatisfaction or disagreement with the weight of the evidence or the jury's verdict, or the trial court absolved itself of or misconstrued its thirteenth juror function may this Court reverse the judgment and order a new trial. Moats, 906 S.W.2d at 435; Carter, 896 S.W.2d at 122.

Here, the trial court overruled the Defendant's motion for a new trial. The trial judge explicitly stated: "In my opinion the jury was justified in finding the Defendant guilty. I approved the verdict of the jury and I declined as a thirteenth juror to set aside the verdict. I'm satisfied with the verdict of the jury in this case." Thus, our review is limited to the sufficiency of the evidence, Moats, 906 S.W.2d at 435; Burlison, 868 S.W.2d at 719, which we have already determined supports the verdict in this case. This issue is without merit.

### III. Brady Violation

The Defendant contends that a new trial is required because the State failed to disclose exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, he points out that after the trial, he became aware that the victim had made allegations of rape against two men in 1982. The charges were dismissed after a preliminary hearing. He contends that this is relevant impeachment evidence pursuant to Tennessee Rule of Evidence 608(b) that the victim had "cried wolf" in the past. The Defendant charges that the State should have known this information and should have

furnished it to him. However, the Defendant has presented no proof to support this allegation. Counsel stated at the hearing on the motion for new trial that the records had been expunged. In essence, the Defendant asserts that the State had a duty to investigate the victim.

First, the State counters that the Defendant has waived the issue because he has presented nothing other than the statements of counsel that the victim made a prior rape claim and that statements of counsel are not evidence. Second, the State argues that it had no knowledge of any prior claims by the victim. The State acknowledges a duty to search for information, but that no law requires them to ask the victim about prior claims. Finally, the State claims that such evidence would not be material to the case.

We agree that the allegations contained in pleadings and statements made by counsel during a hearing or a trial are not evidence. The same is true with regard to the recitation of facts and argument contained in a brief submitted to this Court. State v. Dykes, 803 S.W.2d 250, 255 (Tenn. Crim. App. 1990); State v. Bennett, 798 S.W.2d 783, 789 (Tenn. Crim. App. 1990). Because the Defendant has presented nothing but the transcript from the motion hearing that contains allegations made by counsel, this issue is waived.

Even if we were to consider this issue as limited to the facts outlined by counsel during the presentation of the motion, we would conclude that it has no merit. Brady requires the State to divulge exculpatory evidence, including that used to impeach a witness. Foster v. State, 942 S.W.2d 548, 550 (Tenn. Crim. App. 1996). Yet, there is no general constitutional right to discovery in a criminal

case, see Weatherford v. Bursey, 429 U.S. 545, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977), and the State is not obligated to make an investigation, or to gather evidence, for the defendant. See State v. Reynolds, 671 S.W.2d 854, 856 (Tenn. Crim. App.1984).

In Foster, the State had a tape recording in its possession which it failed to review to determine whether it contained exculpatory material. This Court has held that Brady also requires a duty to search possible sources of exculpatory information, yet only for "'non-trivial prospects' of material exculpatory information." Foster, 942 S.W.2d at 550. In contrast, the State had no notice of prior claims by the victim and because the records had been expunged, no information was obtainable. Furthermore, we cannot conclude that the State had a duty to cast a dragnet investigation into the victim's past conduct without being on some notice that "non-trivial" information existed. Thus, we could only conclude that this issue is without merit.

## IV. Hearsay Evidence

In his fourth issue, the Defendant argues that the trial court erred in admitting the testimony of Wanda Lucas, which violated the hearsay evidence rule. Over defense counsel's objection, the trial court admitted Ms. Lucas' testimony under the excited utterance exception to the hearsay rule. Tenn. R. Evid. 803(2). An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2).

A jury-out hearing was held in which Wanda Lucas testified that the victim telephoned because she needed to talk. Ms. Lucas estimated that the victim called sometime after 2:30 p.m., but before dark. However, she did not believe the victim called her as late as 6:00 p.m. Her best estimate of the time when the victim called was 3:00 or 3:30 p.m. She came over to see the victim, who was crying, had red eyes and makeup smeared on her face. The victim was very shaky, upset and confused. Ms. Lucas tried to calm her down. Ms. Lucas stated that the victim appeared disoriented and that she was more upset than she had ever seen her. Upon hearing this testimony, the trial court ruled it admissible as an excited utterance.

The test for determining that a statement qualifies as an excited utterance is spontaneity and logical relation to the event. State v. Smith, 857 S.W.2d 1, 9 (Tenn. 1993). The declaration must arise while the person is "still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." Id.; see State v. Kendricks, 891 S.W.2d 597, 604 (Tenn. 1994). Here, the victim reported the incident approximately three hours after it occurred. She appeared tearful and confused when she first saw Ms. Lucas. Ms. Lucas helped her calm down. Neither her ability to calm down nor the fact that she did not report the incident for a few hours precludes a finding that the victim was still suffering from the stress of excitement from the rape. See State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993); State v. Lavelle Winfrey, C.C.A. No. 02C01-9210-CC-00235, Tipton County (Tenn. Crim. App., Jackson, Feb. 23, 1994), perm. to appeal denied (Tenn. 1994). In Winfrey, the victim reported an attempted rape two hours after it occurred and third-party testimony was admitted under the excited utterance

exception. Here, the victim reported the rape three hours later and appeared very upset and shaky. We cannot conclude that the trial court erred in admitting the statements made by the victim to Wanda Lucas. This issue is without merit.

V. Audiotape Transcripts

The Defendant next argues that the trial court erred in refusing to admit the transcripts of the two telephone calls of the victim talking with the Defendant. He asserts that the trial court's failure to allow introduction of the transcripts violates due process because the jury had to rely on "rambling and redundant" conversations that they heard one time.

Tape recordings and compared transcripts are admissible and may be presented into evidence by any witness who monitored the conversations if he or she was in a position to identify the declarant with certainty. State v. Jones, 598 S.W.2d 209, 223 (Tenn. 1980), overruled on other grounds by State v. Shropshire, 874 S.W.2d 634, 638 (Tenn. Crim. App. 1993). The trial judge must control the mode and manner of the introduction of evidence to the jury, and has wide latitude and discretion in determining the nature of the evidence to be considered. State v. Elrod, 721 S.W.2d 820, 823 (Tenn. Crim. App. 1986). We may not disturb the rulings of the trial judge absent an abuse of discretion. Id. We find no abuse of discretion in this case. The tape-recorded conversations were clearly admissible because they were authenticated by Mrs. Harwood, who was present and participated in their creation. However, defense counsel attempted to authenticate the transcripts of the calls through Detective Boomershine. Proper authentication of transcripts requires that they be

compared to the tapes and evaluated for their accuracy. <u>See</u> <u>State v. Cameron</u>, 909 S.W.2d 836, 850 (Tenn. Crim. App. 1995); <u>State v. Smith</u>, 656 S.W.2d 882, 888 (Tenn. Crim. App. 1983).

In the case at bar, the trial judge examined the detective regarding the accuracy of the transcripts. Detective Boomershine stated that he or someone at the sheriff's department reviewed the transcripts for their accuracy. The detective testified that they were accurate "to my knowledge" but did not clearly state that he carefully reviewed the tapes for accuracy. Apparently, the trial judge was not satisfied that the transcripts were properly authenticated and thus, did not allow their submission to the jury. We cannot conclude that the trial judge abused his discretion. This issue is without merit.

## VI. Motion to Suppress the Tapes

The Defendant claims that the trial court erred by failing to grant his motion to suppress the tape-recorded telephone calls between the victim and the Defendant. He argues that the victim acted as an agent of the State and engaged in overreaching police conduct violative of due process and the Fourth and Sixth Amendments to the United States Constitution. We disagree and conclude that this issue is without merit.

The United States Constitution provides no protection for those who voluntarily offer information to a confidant. The Supreme Court has found no violations under the Fourth, Fifth or Sixth Amendments. <u>See</u> <u>Clariday v. State</u>,

552 S.W.2d 759, 768 (Tenn. Crim. App. 1976) (citing Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966)).

> If the law gives no protection to the wrongdoer whose trusted accomplice is or becomes a police agent, neither should it protect him when that same agent has recorded or transmitted the conversations which are later offered in evidence to prove the State's case.

Clariday, 552 S.W.2d at 768 (quoting United States v. White, 401 U.S. 745, 752, 91 S.Ct. 1122, 1126, 28 L.Ed.2d 453 (1971) (plurality opinion)). Nor do the circumstances in this case, although deceptive, rise to the level of implicating notions of fair play as protected by the Fourteenth Amendment. See State v. Branam, 855 S.W.2d 563, 568-69 (Tenn. 1993). In fact, the surreptitious recording of conversations has been sanctioned by statute. Tenn. Code Ann. § 39-13-601(b)(4). "It is lawful . . . for a person acting under the color of law to intercept a wire, oral or electronic communication, where the person is a party to the communication . . . . Tenn. Code Ann. § 39-13-601(b)(4). The Defendant misplaced his trust in the victim and volunteered incriminating statements. The trial court did not err in denying the Defendant's motion to suppress the telephone conversations.

## VII. Defective Indictment

The Defendant argues that the indictment was fatally defective because it failed to allege the requisite mens rea. The indictment contains the following language:

> The Grand Jurors for Sullivan County, Tennessee, duly empaneled and sworn, upon their oath present that ROBERT BACON on or about March 28, 1995 in the State and County aforesaid and before the

finding of this Indictment did unlawfully and forcibly sexually penetrate, by inserting his penis into her mouth, Lisa Harwood, in violation of T.C.A. §39-13-503, and Against the peace and dignity of the State of Tennessee.

An indictment or presentment must provide notice of the offense charged, an adequate basis for the entry of a proper judgment, and suitable protection against double jeopardy. State v. Trusty, 919 S.W.2d 305, 310 (Tenn. 1996); State v. Byrd, 820 S.W.2d 739, 741 (Tenn. 1991); State v. Lindsay, 637 S.W.2d 886, 890 (Tenn. Crim. App. 1982). The indictment "must state the facts in ordinary and concise language in a manner that would enable a person of common understanding to know what is intended, and with a degree of certainty which would enable the court upon conviction, to pronounce the proper judgment." Tenn. Code Ann. § 40-13-202; Warden v. State, 214 Tenn. 391, 381 S.W.2d 244, 245 (1964).

A lawful accusation is an essential jurisdictional element, thus, a prosecution cannot proceed without an indictment that sufficiently informs the accused of the essential elements of the offense. State v. Perkinson, 867 S.W.2d 1, 5 (Tenn. Crim. App. 1992); State v. Morgan, 598 S.W.2d 796, 797 Tenn. Crim. App. 1979). A judgment based on an indictment that does not allege all the essential elements of the offense is a nullity. Warden v. State, 381 S.W.2d at 245; McCracken v. State, 489 S.W.2d 48, 53 (Tenn. Crim. App. 1972). Furthermore, the Tennessee Code provides that "[i]f the definition of an offense within this title does not plainly dispense with a mental element, intent, knowledge, or recklessness suffices to establish the culpable mental state." Tenn. Code Ann. § 39-11-301(c).

Our supreme court has recently held that :

for offenses which neither expressly require nor plainly dispense with the requirement for a culpable mental state, an indictment which fails to allege such mental state will be sufficient to support prosecution and conviction for that offense so long as

(1) the language of the indictment is sufficient to meet the constitutional requirements of notice to the accused of the charge against which the accused must defend, adequate basis for entry of a proper judgment, and protection from double jeopardy;
(2) the form of the indictment meets the requirements of Tenn. Code Ann. § 40-13-202; and
(3) the mental state can be logically inferred from the conduct alleged.

State v. Roger Dale Hill, Sr., No. 01S01-9701-CC-00005, Wayne County (Tenn., Jackson, November 3, 1997).

Here, the indictment clearly satisfies the constitutional notice requirements. There was adequate notice that the Defendant was charged with the statutory offense of rape as codified in Tennessee Code Annotated section 39-13-503 which contains the essential elements of the offense. Here too, is sufficient information by which the trial judge could pronounce judgment for the offense of rape. Finally, the Defendant is adequately protected against a second prosecution for an offense of rape of the victim occurring on March 28, 1995.

Regarding the second requirement, it is also apparent that the indictment was drafted such that a person of ordinary intelligence could understand with what offense he was charged. The indictment also sufficiently stated the factual circumstances by alleging that the Defendant "did unlawfully and forcibly sexually penetrate, by inserting his penis into her mouth, Lisa Harwood." It is clear who the victim was and what specific act of forcible sexual penetration the Defendant

was called to defend against. Likewise, the third requirement of the test, that the mental state be logically inferred from the indictment, has been met. The allegation of "force" contemplates a mental state. As defined in the Code, "'[f]orce' means compulsion by the use of physical power or violence and shall be broadly construed to accomplish the purposes of this title." Tenn. Code Ann. § 39-11-106(a)(12). Force implies that the power is directed toward an end and without the consent of the victim. Lundy v. State, 521 S.W.2d 591, 594 (Tenn. Crim. App. 1974). Thus, the elements of the charged offense imply that the Defendant possessed some level of awareness of his actions that would satisfy proof of a culpable mental state under section 39-11-301(c). Therefore, we conclude that the indictment in this case adequately informed the Defendant of the charges against him and that this issue is without merit.

VIII. Trial Court's Failure to Rule on Motions

The Defendant alleges that the trial judge never ruled on two issues and that, as a result, he was prejudiced because he was prevented from developing a record for appeal. He first contends that the trial court failed to rule on his motion to suppress the telephone conversations. The trial court considered the Defendant's motion to suppress prior to trial and, as the Defendant suggests, the trial court did reserve judgment. At the hearing on January 5, 1995, the trial judge stated: "I'm not going to suppress anything today. I'll rule on it at the trial." On the 16th of April, before trial, the Defendant again raised the motion. In reference to the State's admitting the tapes, the trial court ruled that "[t]hey (the tapes) would be admissible."

Rule 12(e) of the Tennessee Rules of Criminal Procedure provides that "[a] motion made before trial shall be determined before trial unless the court, for good cause, orders that it be deferred for determination at the trial of the general issue or until after verdict, but no such determination shall be deferred if a party's right to appeal is adversely affected." See State v. Aucoin, 756 S.W.2d 705, 709 (Tenn. Crim. App. 1988); Bolton v. State, 591 S.W.2d 446, 449 (Tenn. Crim. App. 1979); Feagins v. State, 596 S.W.2d 108, 109-10 (Tenn. Crim. App. 1979). "Before trial" means before the day the trial is scheduled to begin. Aucoin, 756 S.W.2d at 709.

Here, the trial court heard arguments on the motion to suppress on January 5, 1995, and made no specific ruling. Defense counsel raised the motion again on the day of trial prior to the jury being empaneled. The trial court ruled at that time that the tapes were admissible. We agree that the trial court should have ruled on the Defendant's motion prior to the day of trial. However, we see no evidence that the Defendant was prejudiced by the delay. He has preserved the issue for appeal, and we have considered the merits of his claim and concluded that the tapes were properly admitted.

The Defendant also contends that the trial court failed to rule on the admissibility of the transcripts of the tape-recorded telephone calls. Defense counsel requested that they be admitted. The trial judge examined Detective Boomershine and determined that they were not properly authenticated. Although the trial judge did not state explicitly on the record, it is apparent that he did not consider them admissible. Furthermore, the Defendant has not

demonstrated that the trial court's failure to admit the transcripts has prejudiced him. This issue is without merit.

## IX. Failure to Grant a Mistrial

The Defendant first argues that the State requested an interlocutory appeal in the presence of the jury. He claims that this was prejudicial to him and that a mistrial should have been granted. The State asserts that the record reflects that the request was made outside the presence of the jury.

The request for appeal arose after the trial judge asked if any member of the jury had a question to submit to Mrs. Harwood, the victim, while she was still on the stand testifying. The State requested a jury-out hearing and argued against the trial court's actions. The State asked for an interlocutory appeal. The jury returned to open court, at which time the trial judge asked if anyone had a question. At that point, the State again requested an interlocutory appeal, which was overruled. After two other witnesses testified, the State renewed its request for an interlocutory appeal, which was denied. The State then asked for a mistrial, which was denied, and the Defendant asked for a mistrial, which was denied. Because the Defendant has failed to cite authority to support his argument, this issue is waived. Tenn. Ct. Crim. App. R. 10(b); State v. Killebrew, 760 S.W.2d 228, 231 (Tenn. Crim. App. 1988).

Even if we consider the issue on its merits, we cannot conclude that the State engaged in such conduct that the Defendant was prejudiced. Our review of prosecutorial misconduct consists of considering five factors to determine

whether the prosecutor's statements affected the verdict. <u>Judge v. State</u>, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); <u>State v. Davis</u>, 872 S.W.2d 950, 953-54 (Tenn. Crim. App. 1993). These are (1) the conduct complained of viewed in the context and in light of the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case. <u>Judge</u>, 539 S.W.2d at 344. The assistant district attorney had asked for an interlocutory appeal in a jury-out hearing, then interjected the request again in front of the jury. After two witnesses testified, the Defendant asked for a mistrial, which was denied. The trial court issued no curative instructions. The Defendant cites no additional instances of misconduct by the State. Therefore, in the context of the entire case, we cannot conclude that the Defendant was denied a fair trial.

The Defendant also charges that a mistrial should have been granted because an agent of the State had contact with the victim before she testified. At the commencement of the trial, the rule on sequestration of witnesses was invoked. The victim, Mrs. Harwood, was waiting in the witness' waiting area for her turn to testify. When it was apparent that the victim would be called next to testify, Anna Sue Lavin, a victim advocate employed by the State, had contact with her. A jury-out hearing was held. Ms. Lavin testified that she told the witness she was next so she could use the restroom. The victim asked for some tissues, which Ms. Lavin provided. Ms. Lavin told the witness not to be nervous. There was no discussion regarding the testimony in the case. The trial court denied the Defendant's motion for a mistrial.

The rule on sequestration of witnesses "is designed to detect falsehood as well as to prevent any witness from coloring his, or her, testimony either purposely or through influence by talking to other witnesses and hearing them talk." Nance v. State, 210 Tenn. 328, 333, 358 S.W.2d 327, 329 (1962). If a witness violates the rule and his or her testimony is material, permitting that witness to testify is not error unless the wronged party can show prejudice. State v. Wicks, 729 S.W.2d 283, 285 (Tenn. Crim. App. 1987). The Defendant has demonstrated no prejudice he has suffered from allowing the victim to testify after contact with Ms. Lavin, therefore, this issue is without merit.

X.  The Jury's Submission of Questions to a Witness

Finally, the Defendant argues that the trial court erred by allowing the jury to submit questions to the victim at the conclusion of her testimony. At the conclusion of questions submitted by counsel, the trial judge examined the victim. After he asked several questions, he recessed the jury to submit any questions they had for the witness. After the jury returned to the courtroom, the trial judge asked the witness two questions: one regarded how long the victim and the Defendant knew each other, the other clarified whether the Defendant ejaculated in the victim's mouth. The State requested an interlocutory appeal, and both the State and the Defendant requested a mistrial on this issue, all of which were denied.

Although we find the trial court's actions highly irregular, we do not find it to be reversible error in the case sub judice. A trial court judge should exercise his right to call and examine a witness with great care, and should do so only

when it may be necessary to avoid a miscarriage of justice. Tenn. R. Evid. 614(a); Coffee v. State, 188 Tenn. 1, 216 S.W.2d 702 (1948); State v. Brock, 940 S.W.2d 577, 581 (Tenn. Crim. App. 1996). However, the trial court has discretion to interrogate witnesses. Tenn. R. Evid. 614(b). "The court, must, however, be scrupulously careful not to indicate to the jury its opinion as to the guilt or innocence of the accused, especially in examining the accused himself, which would be not only improper, but prejudicial error." Brock, 940 S.W.2d at 581(citation omitted); see Tenn. Const. art. VI, §. 9 "[The] trial judge should examine witnesses only in rare instances and then only by a few questions necessary to clear up the situation, it being better to suggest to counsel the additional information desired, and let him ask the questions." Id.

Here, after the State and defense counsel questioned the witness, the trial judge interrogated the victim on several points. He made no specific comments regarding the evidence, but pointedly questioned the witness. While the victim was still on the stand, the trial court recessed the jury for any individual jurors to compile questions for the witness. He instructed the jury not to discuss the case in any way. He stated that any juror who had a question could raise his or her hand and he would submit a written question. Two questions were asked. The trial court's actions were clearly unusual, however, we cannot conclude that the trial judge commented on the evidence such that it violated the Defendant's rights. In fact, he remarked that "[t]his is a search for the truth." In Brock, the answers to the trial court's examination of the defendant established elements necessary to prove the State's case. Brock, 940 S.W.2d 581. Here, however, the jury's questions only clarified some details about the incident. After

considering the entire record in the case sub judice, we are satisfied that this was harmless error. T.R.A.P. 36(b); Tenn. R. Crim. P. 52(a).

We do recognize that this practice on the part of trial judges should be discouraged. It is apparent that such practices place trial judges at a greater risk of appearing biased and potentially placing the jury in a position to begin deliberations about the case prematurely.

## XI. Sentencing

The State has also appealed regarding the Defendant's sentence. The State argues that the trial court erred by sentencing the Defendant to community corrections when he was statutorily ineligible for such a sentencing alternative. The Defendant counters that, although the trial court's intentions were unclear, it appears that the trial judge was attempting to sentence him to probation.

The Defendant was convicted of rape, which is a Class B felony. Tenn. Code Ann. § 39-13-503(b). The range of punishment for a Range I, standard offender is eight (8) to twelve (12) years for the offense. Tenn. Code Ann. § 40-35-101. A sentencing hearing was held on May 10, 1996. The Defendant submitted mitigating factors which are not reflected in the record, but of which one appears to be that the Defendant had no prior criminal record. The Defendant argued that the minimum sentence in the range of eight (8) years would be appropriate. The State submitted no enhancement factors, but argued that the facts and circumstances of the crime should support the imposition of a

ten-year (10) sentence.  The Defendant also submitted a request for probation.

The Defendant offered witnesses on his behalf.  His wife, Amy Bacon, testified.  The trial court took notice that there were a number of other witnesses, but rather than taking more testimony as the Defendant requested, he ordered defense counsel to gather letters from these persons to supplement the presentence report because it was inadequate.  The hearing was continued until June 28, 1996.  Without reference to the sentencing principles, the trial judge sentenced the Defendant to eight (8) years as a Range I offender.  The State filed an appeal regarding the sentencing issue.  See State v. Hayes, 894 S.W.2d 298, 300 (Tenn. Crim. App. 1994).

When the State challenges the length, range, or the manner of service of a sentence, this court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-402(d).  This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In conducting a de novo review of a sentence, this court must consider: (a) the evidence, if any, received at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement that the defendant made on his own behalf; and (g) the potential or lack of

potential for rehabilitation or treatment.  Tenn. Code Ann. §§ 40-35-102, -103, and -210; see State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after having given due consideration and proper weight to the factors and principals set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result.  State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The record is clear that the trial court failed to apply the sentencing principles and state them on the record, so we must we conduct a de novo review of the Defendant's sentence.   The State challenges only the manner of service of the sentence, therefore, we are satisfied after reviewing the record that the eight-year sentence is appropriate in these circumstances.

However, the trial court's treatment of the probation request is problematic.  At the June 28 hearing, the trial court considered the presentence report.  He also determined that the Defendant's lack of a prior record could be considered in mitigation and applied two sentence enhancement factors as possible bases to deny probation.  These were that the offense was committed to gratify the defendant's desire for pleasure or excitement and that he abused a position of private trust. The trial judge ordered the Defendant to spend one (1) year in Hay House, which this Court believes to be a community corrections program.  See State v. Boston, 938 S.W.2d 435, 437 (Tenn. Crim. App. 1996).  He reset a hearing for August 30, 1996, to review the Defendant's progress.

At the August 30 hearing, the trial court reviewed a scant, two-paragraph report from Nancy Lanthorn, Ph.D., which stated basically that the Defendant had a better understanding of his circumstances and that his prognosis was good. There were documents reflecting the counseling hours he underwent. The State offered no evidence or argument. The trial judge then ordered: "This sentence will stay as it was." What the sentence "was" remains a mystery. The judgment form reflects that the Defendant was sentenced to eight years in community corrections and specifies an evaluation in Hay House. There is no reference to probation in the judgment.

A defendant is eligible for probation if the sentence imposed upon him or her is eight (8) years or less. Even though probation must be considered, a defendant is not automatically entitled to probation as a matter of law. Fletcher, 805 S.W.2d at 787. Factors such as the defendant's potential for rehabilitation, the nature and seriousness of the offense, and deterrence of others in committing the crime, and whether the record reflects multiple or recent unsuccessful sentencing measures other than confinement, can be used to rebut the presumption that alternative sentencing is appropriate. Id. at 788-89. Eligibility for sentencing under the Community Corrections Act is set out in Tennessee Code Annotated section 40-36-106(a) and (c), as follows:

> (a) An offender who meets all of the following minimum criteria shall be considered eligible for punishment in the community under the provisions of this chapter:
>
> (1) Persons who, without this option, would be incarcerated in a correctional institution;
>
> (2) Persons who are convicted of property-related, or drug/alcohol-related felony offenses or other felony offenses not

involving crimes against the person as provided in title 39, chapter 2, parts 1, 2, 3, 5, 6, and 7;

(3) Persons who are convicted of nonviolent felony offenses;

(4) Persons who are convicted of felony offenses in which the use or possession of a weapon was not involved;

(5) Persons who do not demonstrate a present or past pattern of behavior indicating violence;

(6) Persons who do not demonstrate a pattern of committing violent offenses; and

(7) Persons who are sentenced to incarceration or on escape at the time of consideration will not be eligible.

(c) Felony offenders not otherwise eligible under subsection (a), and who would be usually considered unfit for probation due to histories of chronic alcohol, drug abuse, or mental health problems, but whose special needs are treatable and could be served best in the community rather than in a correctional institution, may be considered eligible for punishment in the community under the provisions of this chapter.

The Defendant is not eligible under subsection (a) because he cannot meet the requirements of subsection (a)(2) of the minimum criteria. As to subsection (a)(2), rape is clearly a felony offense involving a "crime against the person" and is proscribed in title 39, chapter 2, part 5. Furthermore, there is nothing in the record that reflects that the Defendant had a "special need" under subsection (c). See Boston, 938 S.W.2d at 439. We do note that subsection (f) provides that a defendant may be sentenced to community corrections as a condition of probation. Tenn. Code Ann. § 40-36-106(f). However, we do not believe that this provision waives the requirements for eligibility for community corrections. Such a practice would undermine the goals of the community corrections programs.

The Defendant concedes that he is not eligible for community corrections, but claims that the trial court intended to place him on probation. While there are

indications in the record that the trial judge was considering probation, the judgment reflects a sentence in community corrections. Because of the apparent contradictions in the record, combined with the Defendant's ineligibility for community corrections, we are unable to adequately review the manner of service of the sentence. Therefore, we believe that the best course is to remand this case to the trial court for the purpose of properly determining the manner of service of the sentence.

The Defendant's conviction for rape is affirmed. This case is remanded to the trial court to determine the manner of service of the eight-year sentence.

_____
DAVID H. WELLES, JUDGE

CONCUR:

_____
THOMAS T. WOODALL, JUDGE

_____
JOHN K. BYERS, SENIOR JUDGE