**STATE of Tennessee, Appellee,**

v.

**Leonard Leon SMITH, Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

March 24, 1983.

Permission to Appeal Denied by Supreme Court Aug. 29, 1983.

John F. Southworth, Jr., Asst. Atty. Gen., Nashville, Jerry S. Sloan, Peter J. Strianse, Thomas J. Evans, William H. Cox, III, Asst. Dist. Attys. Gen., Chattanooga, for appellee.

Jerry Summers, Thomas L. Wyatt, Chattanooga, for appellant.

## OPINION

DAUGHTREY, Judge.

In this case Leonard Leon Smith, a Chattanooga fireman, was found guilty of arson in the burning of his own property. The most significant question raised on appeal concerns the admissibility of evidence that the fire was intentionally set, evidence which the defendant claims was secured in violation of his Fourth Amendment rights. Also at issue are the admissibility of certain taped conversations between Smith and his accomplice, Terry Glover; the correctness of the jury instructions; the prosecution's alleged failure to disclose favorable evidence prior to trial; and the trial court's denial of a suspended sentence. After a review of the record, we find no reversible error in connection with these issues. But in addition the defendant has challenged the validity of the jury's verdict, and because we conclude that the jury may have misunderstood the trial court's instruction relative to the sentence to be assessed, we find it necessary to modify that portion of the judgment.

On September 30, 1980, fire effectively destroyed a house located at 912 Endicott Street in Chattanooga. Defendant Smith, a captain in the Chattanooga Fire Department, owned the house and had rented it to Terry Glover, a fireman assigned to Smith's command, Engine Company No. 12. A few months before the fire, Smith actually sold the house on Endicott Street to Glover, but when Glover was unable to make the payments, Smith bought it back and once again rented it to Glover.

Glover, testifying for the State, said that in August 1980, Smith told him that the Endicott Street house was "breaking him" and suggested that they burn it. Glover agreed to set fire to the house in exchange for forgiveness on a $1700 note stemming from his aborted purchase of the house, plus $2000 of any realized insurance proceeds.

Over the next few weeks, Smith and Glover planned the arson. Because the house was located in the fire district served by Engine Company No. 12, Smith knew that he would be in charge of extinguishing the fire. Smith chose September 30, a date when Glover was scheduled to work a second job setting up a show at the city auditorium. Smith planned to put a private in charge of the fire and take the driver's seat himself, driving other than the shortest route from the station to the house. According to Glover, Smith also planned to use a reserve fire engine and to forego laying a line from a fire hydrant, relying instead on the fire truck's water tanks.

On the day of the fire, Glover worked at the auditorium from 8:00 a.m. to 5:00 p.m. Jim Gentry, another fireman assigned to Company No. 12, had also been given the day off and was working at the auditorium with Glover. Gentry drove Glover home at 5:00 p.m. and arranged to take him back to the auditorium at 9:00 p.m., when they were expected to dismantle the show. Glover waited until about 8:00 p.m. and then went to the attic, poured Coleman fuel and turpentine around the attic and down the attic stairs. When Gentry drove up, Glover threw a match on the stairs, and the fuel blew up. Glover then left the house and rode to the auditorium with Gentry.

Some 30 to 45 minutes later, Glover was told that his house was on fire. He rushed to Endicott Street, where he found Smith and asked whether the house was "burned

good enough." Smith replied that the fire "went through the roof. It's totalled."

The alarm had been received at Engine Company No. 12 at 9:46 p.m. Captain Smith and a reduced company of two other firefighters were the first to arrive on the scene. After ordering Private James N. Lee to serve as "acting captain," Smith drove the fire truck himself. It was a reserve engine, in use because Smith had consigned the company's regular engine to the repair shop that afternoon. At the scene, the lines were laid from the truck rather than a hydrant. There is no proof in the record that this was an unusual situation, however, and no proof that the fire engine had been misrouted.

Despite the fact that Lee was "acting captain," the field report was filled out by defendant Smith, who then signed Lee's name to the bottom of the report. It listed the cause of the fire as "electrical." Lee maintained at trial that he had reached this conclusion independently, based on the condition of some electrical wiring found in an area of the house that had not burned.

Two other fire companies had also responded to the fire on Endicott Street. In addition, District Chief Cecil Houts drove to the scene of the fire and conferred with Smith about putting it out. Houts testified, however, that as commander of the company in whose district the fire was located, Smith was the officer in charge of the fire and was responsible for determining the cause of the fire and filling out the necessary paperwork once the blaze was extinguished. Normally, Houts testified, it would have been up to Smith to decide whether the fire was suspicious in nature and, if so, to call the arson squad to the scene.

Actually, several of the firefighters at the Endicott Street blaze thought the fire looked suspicious, principally because of the sparse amount of furnishings in the house, but also because of the nature of the fire. Captain Billy Joe Williams of Company No. 16 mentioned his suspicions to Chief Houts at the scene; Williams later testified that he would have called the arson squad to the scene had it been "his fire." Houts, however, knew that the house belonged to Smith and, following departmental policy, he deferred to Smith's decision not to call in the arson investigators. Houts testified that he wanted to give his colleague "the benefit of the doubt." He was obviously uneasy about this decision, however, because he discussed the possibility of arson with Smith the next day. Again, Smith failed to take any action. Instead he told Houts that the meagerness of the furnishings was due to Glover's recent separation from his wife, who had moved out of the house taking her personal belongings with her.

In the meantime, the field report of the Endicott Street fire reached the desk of Captain Roy Dickey, chief arson investigator for the Chattanooga Police Department. Because of the large dollar loss involved and the fact that the house was owned by one fire department official and occupied by another, Dickey apparently decided that the incident merited investigation. No official investigation had been requested, however, and Dickey felt he did not have enough evidence to establish probable cause to secure a warrant. He therefore decided that the only way to "determine if there had been a fire and what the origin of the fire was," was to inspect the house for himself. Thus, he and Officer Charles Love went to 912 Endicott Street on October 3, three days after the fire. During a cursory walk-through of the house, they noticed the suspicious manner in which the attic stairs had burned and the presence of multiple "hot spots" in the attic, indicating that the fire had more than one point of origin. Dickey and Love took no evidence from the scene, instead using the information they had gleaned from their inspection to secure a search warrant for the premises.

Two weeks later they returned to 912 Endicott Street with a warrant, took pictures of the house and its interior and confiscated evidence, including debris and "rag trailers" found in the attic. Based on evidence seized pursuant to the search warrant, the officers became convinced that the

fire had been deliberately set, and they initiated an official investigation of Glover and Smith.

Glover eventually confessed to the crime and implicated Smith. In order to obtain corroborating evidence, Captain Dickey had Glover wired and recorded four conversations and a telephone call between Glover and Smith that occurred some eight months after the fire occurred. These tapes, along with transcripts of them, were admitted into evidence at trial. The tapes reveal no outright confession by Smith—no "smoking gun." But, as the trial judge noted, the overall tenor of the tapes was highly damaging to Smith's case. The conversations are those of two guilty people intent on "keeping their stories together" and thus thwarting the arson investigation.

In addition to Glover's testimony and the taped conversations, there was a great deal of evidence at trial that the fire at 912 Endicott Street had been intentionally set. Captain Dickey testified that there were discernable "pour puddles," that is, places where an accelerant had obviously been poured. Also, the fire was much more intense than it would have been without the use of accelerants, and it burned down the attic steps rather than up them as would have occurred if the fire had been accidental. Further, an expert witness for the State testified that he found turpentine in samples of the debris taken from the attic.

The defendant moved to suppress all this evidence prior to trial, arguing that because investigators came onto his property on October 3 without a warrant, his rights under the Fourth Amendment were violated and that evidence seized pursuant to subsequent warrant must be excluded as the "fruit of the poisonous tree." In this regard, he relied on the United States Supreme Court's ruling in *Michigan v. Tyler,* 436 U.S. 499, 511, 98 S.Ct. 1942, 1950, 56 L.Ed.2d 486 (1978), that arson investigators may come to the scene of a fire while efforts to extinguish it are underway and "may remain there for a reasonable time to investigate the cause of the blaze." But, the *Tyler* court held, "additional entries to investigate the cause of the fire must be made pursuant to the warrant procedures governing administrative searches." *Id.*

The State met the defendant's motion to suppress with two arguments. First, the prosecution pointed out that arson investigators were not called to the scene at the time of the fire through the deliberate dereliction of the very person charged with causing the fire, Captain Smith. Indeed, there was testimony suggesting that Smith was cognizant of the requirements of *Michigan v. Tyler,* for he told Glover "that 30 minutes after the firemen [leave] that the arson people can't come on the lot, that we didn't have anything to worry about. . . ." The State argued, in effect, that when discovery of probable cause to obtain a search warrant is defeated by the actions of the very official who stands to lose from the issuance of such a warrant, the party guilty of wrongdoing should be held to have forfeited his rights to object to the warrantless search that results. We think this position is reasonable, constitutionally speaking, and we would not hesitate to recognize an exception to the warrant requirement of *Michigan v. Tyler* under facts such as these, were it necessary to do so. But it not necessary in this case, because the trial judge actually predicated his ruling on the State's alternative theory, that the defendant had no reasonable expectation of privacy in the premises at 912 Endicott Street and thus was not constitutionally harmed by the warrantless inspection on October 3. The court held, in common parlance, that the defendant lacked "standing." *See generally Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

When faced with a challenge to standing at the suppression hearing, the defendant contended that he had the requisite privacy interest in the burned out house because he owned the house and the tenant, Glover, had moved out before the unauthorized inspection occurred. The State argued in response that Glover had paid his rent through the month of October and thus had a superior if not exclusive privacy interest in the house. The proof shows that Smith

and Glover removed most of Glover's belongings from the house the day after the fire. However, at the suppression hearing Glover testified that he went back to the burned out house on several occasions during the week after the fire. He said specifically that one piece of furniture, a dresser, had been left behind and was not picked up until later. Captain Dickey testified that he saw a dresser in the house on October 3. Thus, there is evidence in the record to substantiate the trial court's ruling that Glover still had a right to come onto the premises at the time of the October 3 inspection, a right which he had not abandoned at that time and which he continued to exercise for some period of time thereafter.

 The general rule is that a tenant, not the landlord, has the expectation of privacy in leased premises, unless the lessor has specifically reserved any rights of possession for himself. W. LaFave, *Search & Seizure* § 11.3(a) (1978); *Chapman v. United States,* 365 U.S. 610, 616–17, 81 S.Ct. 776, 779–80, 5 L.Ed.2d 828 (1961). Thus, during the rental period the lessee is assumed to have the privacy interests in the premises, unless he abandons the property. *People v. Morrison,* 196 Colo. 319, 583 P.2d 924, 926 (1978); *State v. Chiles,* 226 Kans. 140, 595 P.2d 1130, 1136 (1979). The test for abandonment is whether the lessee had a reasonable expectation of privacy in the property as of the date of the search. *Id., see also United States v. Wilson,* 472 F.2d 901, 902–03 (9th Cir.1972), *cert. denied* 414 U.S. 868, 94 S.Ct. 176, 38 L.Ed.2d 116 (1973).

Here Glover had paid rent through the month of October and went back to the house several times within a week or so after the fire to remove his personal belongings. In one purported abandonment case, the court found that even though the resident did not occupy the house after the fire, the fact that his personal belongings

were still there at the time of the search and the fact that he had boarded up the front door to keep intruders out proved that he had not abandoned the property and still had a reasonable expectation of privacy in the house when it was searched. *Swann v. Superior Court,* 8 Cal.App.3d 392, 87 Cal. Rptr. 280, 281–82 (1970). Although in this case Glover did not board up the Endicott Street house against intruders, neither did Smith. Indeed, it was stipulated by defense counsel that the house was left "unsecured" after the fire; on October 3, Dickey and Love found both the front and back doors standing open.

 This fact prompts a further observation: not only does the proof show that Glover had not abandoned the premises, but it fails to show that Smith had done anything to assert a privacy interest in the house. There was, for example, no evidence that Smith had ever lived there, stored property there, or even frequented the house.* The law now recognizes that bare title alone does not establish a privacy interest in property. *Rawlings v. Kentucky,* 448 U.S. 98, 105, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980). Thus, even if the proof showed that Glover *had* abandoned the premises, this fact alone would not cause Glover's privacy interest to shift automatically to Smith like some reversionary property interest. We thus reject the defendant's argument that merely "being the owner of the property and maintaining an active effort to collect insurance proceeds on account of the fire" created a reasonable expectation of privacy in the house on Endicott Street for purposes of the Fourth Amendment question raised in his motion to suppress. It follows that the trial court correctly overruled that motion.

 The defendant next contests the admissibility of the taped conversations between Glover and him. He offered no ob-

---

* Compare and contrast Michigan v. Tyler, supra, 436 U.S. at 505, 98 S.Ct. at 1947; in which the Court rejected the argument that "arson establishes abandonment," saying: "People may go on living in their homes or working in their offices after a fire. Even when that is impossi-

ble, private effects often remain on the fire-damaged premises." While this observation might be true as to Glover, under the facts of the case it clearly would not describe Smith's situation vis-a-vis the burned premises.

jection to these tapes at trial, however, and he has therefore waived any objection to them on appeal. Tennessee Rules of Appellate Procedure 36(a). Smith did make timely objection to the introduction of transcripts of the tapes that had been made by police and were furnished to the jury to read as the tapes were played. His principal complaints were that the transcripts were not properly authenticated and that they contained numerous handwritten additions by Glover.

In *State v. Jones,* the Tennessee Supreme Court set out the proper procedure for the authentication and admission of tapes and transcripts:

> Tape recordings and compared transcripts . . . may be presented into evidence by any witness who was present during their recording or who monitored the conversations, if he was so situated and circumstances that he was in a position to identify the declarant with certainty, and provided his testimony in whole, or in part, comports with other rules of evidence.

598 S.W.2d 209, 223 (Tenn.1980). Here the transcripts were authenticated by Glover, who was a participant in the recorded conversations. The record indicates that he spent several days going over the transcripts while listening to the tapes to ensure the accuracy of the transcripts.

During his review of the tapes, Glover also made certain handwritten clarifications and additions to the transcripts, to which the defendant strenuously objected at trial. Because Glover was a participant in the conversations and was a proper person to edit the transcripts for accuracy, however, we find no impropriety in this regard. Moreover, before the transcripts were given to the jury, the trial court gave them the following instructions:

> You have been handed a document which purports to be a transcript of a tape recording that you're about to hear. It has been given to you to assist you in following along in listening to the tape. You're the judge of whether it's an accurate transcript of the tape that you're about to hear. If you find that it is not

an accurate transcript of the tape you hear, the tape itself is the thing you are to consider. The tape is the evidence that you are about to receive.

Thus, any possible error was rendered harmless by the trial court's instruction.

Nor do we find any reversible error in the trial court's decision to allow the jury to review two of the transcripts during deliberation. The trial court followed the procedure set out in the *ABA Standards Relating to the Administration of Criminal Justice, Trial by Jury* § 5.2(a), which was explicitly adopted by this court in *State of Tennessee v. Robert Leo Dunlap,* Court of Criminal Appeals at Knoxville, March 16, 1981.

Having held that both the evidence secured pursuant to the execution of the search warrant and the taped conversations between Smith and Glover were properly introduced into evidence, we have no difficulty in concluding that the evidence was sufficient to sustain the jury's verdict. The proof shows that the fire was intentionally set, and Glover's testimony implicating Smith was sufficiently corroborated by the tape recordings.

The defendant next complains of the trial court's refusal to give a requested charge to the effect that accomplice testimony must be examined with greater care than that of an ordinary witness, to ensure that it has not been affected by bias or interest. This form of accomplice instruction is apparently in use in the federal courts. But federal law, unlike that of Tennessee, permits a defendant to be convicted on the uncorroborated testimony of an accomplice. *See, e.g., United States v. McCallie,* 554 F.2d 770, 772 (6th Cir.1977). Hence the Tennessee law on accomplice testimony and the related jury instruction actually provide more protection for a defendant than would the federal instruction of the type requested in this case. The trial court did not err in refusing to give it.

Nor did the court err in rejecting a proposed defense instruction to the effect that the defendant should not be held liable

for wilfull wrongdoing if he was merely acting on the advice of his attorney. This charge was not supported by the evidence in the case, and because the instruction was unwarranted, it would have done nothing more than confuse the jury. It was properly denied.

■ Next the defendant claims that he was entitled to have the jury instructed on the lesser included offense of burning insured property, as set out in T.C.A. § 39–3–205. The short answer to this contention is that not all the elements of § 39–3–205 were included in the indictment, and under the rule in *Howard v. State,* 578 S.W.2d 83, 85 (Tenn.1979), the defendant could not be convicted of that offense. It was therefore proper to refuse to charge it. Moreover, the Tennessee courts have previously held that burning insured property is not a necessarily included offense of arson. *Roberts v. State,* 47 Tenn. 359, 363 (1870); *Stanley v. State,* 180 Tenn. 70, 171 S.W.2d 406 (1943).

■ At the hearing on the motion for a new trial, the defense presented numerous witnesses in an effort to establish that the State had withheld exculpatory evidence and that one of the State's witnesses, Captain Dickey, had tried to suppress unfavorable testimony. Most of the evidence and testimony in question related to an incident in which Glover had allegedly burned an automobile a year before the offense in this case. However, this issue related principally to Glover's credibility, and he was cross-examined about it at trial. Moreover, Captain Dickey denied most of the actions attributed to him in connection with the suppression of testimony by various potential witnesses, and the trial judge obviously accredited his testimony. Overall, we find that most of the matters developed at the hearing were either refuted or satisfactorily explained by the prosecution and that any remaining matters, however unfortunate, did not affect the outcome of the trial.

■ The defendant next insists that the trial judge should have suspended his sentence. The main reason given for the denial of probation was that Smith was a professional firefighter convicted of arson. In an analogous situation, in *Woodson v. State,* 608 S.W.2d 591 (Tenn.Cr.App.1980), the trial judge had denied probation to a police officer who was convicted of soliciting a bribe, finding that the officer had violated his oath as a public official to uphold the laws of the community. Reviewing the trial judge's action, this court held that "in determining whether to grant a suspended sentence when a public official is convicted of a crime related to his official duties, a trial court may take into consideration the fact that the official has violated his oath of office and has thereby breached the public trust." *Id.* at 594. We conclude that *Woodson* controls this case and that the trial court did not abuse its discretion in refusing to suspend Smith's sentence.

■ We do have some doubt, however, about the validity of that sentence. It appears that the jury may have been confused in assessing the sentence, or at the very least that their verdict may have been the result of misunderstanding. The trial judge gave the following essentially correct instruction on sentencing:

> Members of the jury, if you find the defendant guilty, beyond a reasonable doubt, of arson as charged in the indictment and as defined and explained to you, it then becomes your duty to fix the minimum term and the maximum term of his confinement in the penitentiary. *The minimum term must be fixed at some time within the range of not less than three years and not more than six years.* And the maximum term must be fixed at some period of time within the range of not more than 21 years and not less than the minimum you fix. (Emphasis added.)

When the jury returned, this exchange took place between the trial judge and the jury foreman:

> THE COURT: Mr. Foreman, has the jury reached a verdict?
>
> THE FOREMAN: We have, Your Honor.
>
> THE COURT: All right, and how do you find the defendant Leonard Leon Smith?

THE FOREMAN: We find the defendant guilty as charged.

THE COURT: And how do you fix his punishment?

THE FOREMAN: *Minimum sentence three to six.*

THE COURT: Would you say that again, Mr. Foreman?

THE FOREMAN: Well, *we understood that the minimum sentence was three to six that we could recommend.*

THE COURT: Now, the jury must fix the punishment and—

THE FOREMAN: Oh, okay.

THE COURT: —and—

THE FOREMAN: All right, we will recommend the three then.

THE COURT: Three years minimum sentence?

THE FOREMAN: Yes, sir.

THE COURT: And what maximum sentence?

THE FOREMAN: Six years. That's what I said—three to six.

THE COURT: Oh, all right. Well, I just didn't quite understand you. All right, a minimum term of three years and a maximum of six years?

THE FOREMAN: Yes, sir.

THE COURT: All right. All right, the verdict of the jury is guilty as charged, of arson, minimum term of three years and a maximum term of six years. If the entire jury agrees with your foreman that that is your verdict, will you signify by raising your right hand. All right, the jury is unanimous. Thank you.

(Emphasis added.)

From this colloquy, it appears that the jury was confused and may have thought that the absolute minimum sentence they could impose was three to six years, rather than three to three years. We believe that any doubt in this regard should be resolved in the defendant's favor. We therefore order the judgment modified to reflect a sentence of not more nor less than three years imprisonment. This modification is subject to the State's consent; if the State desires to resist the reduction, the case will be remanded for a penalty hearing.

As modified, the judgment of the trial court is affirmed.

DUNCAN, J., and RICHARD R. FORD, Special Judge, concur.