# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### December 14, 2010 Session

## STATE OF TENNESSEE v. BOBBY LEE ROBINSON AND JAMIE NATHANIEL GRIMES

### Direct Appeal from the Criminal Court for Davidson County
### No. 2007-B-968    Monte Watkins, Judge

_____

### No. M2009-02450-CCA-R3-CD - Filed December 22, 2011

_____

A Davidson County jury convicted the Defendant, Bobby Lee Robinson, of possession of more than 300 grams of cocaine with intent to sell, a Class A felony; and possession of drug paraphernalia, a Class A misdemeanor.  The jury convicted the Defendant, Jamie Nathaniel Grimes, of possession of more than 300 grams of cocaine with intent to sell, a Class A felony; possession of marijuana, a Class A misdemeanor; and possession of drug paraphernalia, a Class A misdemeanor.  The trial court sentenced Robinson to seventeen years as a standard offender for the cocaine offense, and eleven months and twenty-nine days for the misdemeanor offense, with all of the sentences to be served concurrently.  The trial court sentenced Grimes to thirty years as a multiple offender for the cocaine offense and to eleven months and twenty-nine days for each misdemeanor offense, ordering all of the sentences to be served concurrently.  On appeal, Robinson argues that: (1) the trial court erred when it allowed the State to introduce a redacted tape recording and transcript of statements he made during his arrest; (2) the trial court erred when it denied his motion for judgment of acquittal; and (3) the evidence was insufficient to support his convictions.  Grimes argues that the trial court erred when it: (1) improperly admitted evidence about the weight of the cocaine; (2) denied his motion for disclosure of the confidential informant's identity; and (3) admitted a transcript of a recorded conversation between him and the confidential informant into evidence.  After reviewing the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court as to both Defendants.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES, SP. J., joined. J.C. MCLIN, J., not participating.[1]

Willis Jones, Nashville, Tennessee, for the appellant, Bobby Lee Robinson.
Mark Chapman, Nashville, Tennessee, for the appellant, Jamie Nathaniel Grimes.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Hugh Ammerman and Andrew Jackson, District Attorneys General, for the appellee, State of Tennessee.

## OPINION
## I. Facts

A Davidson County grand jury indicted the Defendants for possession of more than 300 grams of cocaine with intent to sell, possession of marijuana, and possession of drug paraphernalia.[2]  At trial, the parties presented the following evidence:

Detective Justin Fox, a Metropolitan Nashville Police Department officer, testified that he worked on the 20th Judicial District Drug Task Force.  On December 8, 2006, Detective Fox worked on an undercover narcotic investigation with the West Crime Suppression Unit.  Detective Fox was the case officer for the investigation, and he said that a confidential informant helped him with the case.  In exchange for her assistance, the confidential informant received monetary compensation.

Detective Fox identified Robinson and Grimes and said that he came into contact with them on December 8, 2006.  Based on the information that the confidential informant provided him, Detective Fox directed the confidential informant to make a recorded phone call to Grimes.  During the call, Detective Fox heard information that confirmed Grimes's location.  Detective Fox said that, based upon that information, police set up surveillance at 2802 McCampbell Avenue in Donelson,[3] Tennessee, where they believed Grimes to be located.  Detective Fox stated that Grimes, who arranged the meeting location,  decided they should meet at the Back Yard Burgers in Donelson.

_____

[1] The Honorable J.C. McLin died September 3, 2011, and did not participate in this opinion.  We acknowledge his faithful service to this Court.

[2] There was a third defendant, Anthony DeAngelo Collier ("Collier"), who was indicted and tried with Robinson and Grimes.  However, Collier is not a party to this appeal.

[3] The witness testified that the address was in Donelson, Tennessee; however, the correct city is Nashville, Tennessee.  Donelson is a neighborhood of Nashville, Tennessee.

Detective Fox reviewed the transcripts of the recorded phone conversation and testified that the transcript was "a fair and accurate representation . . . of the conversations between the confidential informant and [Grimes]." Detective Fox stated, however, that a portion of the conversation was missing, where Grimes stated to the confidential informant "you talk too F-ing much." Detective Fox further stated that the transcript "assigned or attribute[d] particular statements to the correct particular individual who would have been making them at the time." The State published the transcript to the jury, and the trial court advised them that "[a]lthough [they were] receiving the transcript the actual evidence [was] the recording itself not the transcript."

The State played the recorded conversation in open court. While the recording was playing, Detective Fox stated that he recognized the Robinson's voice in the background. Detective Fox also identified the portion of the tape where the transcript misrepresented Grimes's statement. Detective Fox said that Grimes saying "you talk too much" was significant because "drug dealers tend to not really like to talk a lot on the phone. They feel that they may be listened to or wiretapped or . . . someone might be the police." Detective Fox also said that an individual selling drugs might be concerned about the phone used by someone with whom they were making a transaction because they want to "disassociate phones that might be in their name, maybe another person's name, maybe a hot phone." He explained that a "hot phone" was one that the police had wiretapped.

Detective Fox testified that, during the conversation, the confidential informant said "'You got the 4 & 2?'" which referred to four ounces of crack cocaine and two ounces of powder cocaine. He stated that the informant was attempting to buy four ounces of crack cocaine and two ounces of powder cocaine during the controlled purchase. Police intended to use the drugs as evidence to arrest Robinson and Grimes, so the aim of the undercover operation was not to complete the transaction; but, rather, to set up the transaction.

Detective Fox testified Robinson and Grimes arrived at the Back Yard Burgers in a black Ford F-150 pickup truck registered to the Co-Defendant. Detective Fox stated that they "drove around once as if they were looking for the informant and then drove around [a] second time."

Detective Fox stated that officers involved in undercover drug investigations usually did not dress in uniform. On this particular occasion, the police officers wore vests that said "police" and depicted the police symbol. The officers involved in this transaction also wore badges. He further stated that, while their vehicles looked like

3

regular cars, they had blue lights and sirens.  Detective Fox explained that, during controlled purchases, the officers will have a "takedown signal" such as a certain phrase or word.  In this case, however, Sergeant Gene Donnegan simply gave an order for the officers to move in on the Defendants.

After Sergeant Donnegan gave the takedown signal, the police officers detained and searched the Defendants.  They found a "bag of white rock" in the groin area of Collier's pants.  According to Detective Fox, after police officers recovered the drugs, they placed them in plastic bags and labeled them.  In court, Detective Fox identified the bag of white rock recovered from Collier during the takedown.

Detective Fox estimated that the police officers recovered approximately 160 grams of crack cocaine from the Grimes's vehicle.  He further estimated that 160 grams of crack cocaine would be worth between $5,000 and $6,000.  The police officers also found a 9.6 gram bag of green leafy substance that they believed to be marijuana in the center console of Grimes's vehicle.  They also recovered the vehicle's registration that showed Grimes as the owner of the vehicle.  In addition, a receipt for a furniture payment was in the vehicle that listed Grimes's phone number.  Detective Fox testified that the phone number on the receipt was the same phone number that the confidential informant dialed to speak with Grimes.  The police officers also found a work-related document that showed the same phone number for Grimes.

Detective Fox stated that the officers searched Robinson and Grimes individually and placed them in patrol cars while they searched the truck.  The police officers placed Robinson and Collier in a patrol car together.  Detective Fox said that it was not a good practice to place two defendants in a patrol car together because "normally they can talk to each other about what story they are going to concoct or come up with about what they are going to do and whatnot.  Normally [they] would like to keep them separated and talk [separately] with them."  He said that they placed Robinson and Collier in the same patrol car because they "were stretched thin[, and they] didn't want to hurt patrol [by] having cars out there with [them.]"

Detective Fox stated that he placed a recorder in the vehicle before placing the Defendants in it.  The Defendants engaged in a conversation regarding the circumstances that lead to their arrest.  Throughout the course of the conversation, the terms "whammy," "zip," "bird," and "stack" were used.  Also, Robinson stated that he would have to get his "birdman."  Detective Fox testified that, based on his experience and his knowledge of the language used in drug trade, the terms signify different amounts of cocaine and crack: a "whammy is a gram, [a] zip is an ounce, and [a] bird would be [a] kilo, kilogram."  He said that when Robinson stated in the recording that he would "have to go get [his]

4

birdman," the term "birdman" signified a kilogram dealer. He further stated that a "stack" was $1,000 in slang terms, and where the transcript stated fifteen "stacks," it referred to $15,000.

After the takedown, police officers searched 2802 McCampbell Avenue, the house from which they observed the Defendants leaving before going to the predetermined location of the drug sale. The officers entered the house with Grimes's consent, using a key given to them by Grimes. Detective Fox stated that "quite a bit" of paperwork with the name Larry Collier, Co-Defendant Collier's uncle, was found at the residence. The search of the residence also produced receipts for a cash deposit on the Ford F-150 and for work done on the truck. In addition, police officers found a credit application, tax forms, and checking account information bearing the Grimes's name. Detective Fox said they also found "clothes that would have fit [Grimes], large underwear and shirts of that nature[,]" in the residence.

Detective Fox stated that the back door of the residence, which led to a small kitchen, served as the entry into the three-bedroom residence. Police officers recovered drugs from the kitchen, including on top of the refrigerator, and living areas of the residence. Total, officers found "a little over 300 grams" of cocaine and cocaine base substance at the residence, which had an estimated street value of more than $10,000. The officer opined that the drugs found were intended for sale rather than personal use.

Detective Fox stated that he was familiar with the term "indicia of resale" and said that it meant "[s]tuff that amounts for resale, packed for resale with intent." He said that the manner in which drugs are packaged, large amounts of drugs, large amounts of cash, and cellular phones are all indicia of resale. Officers found $1,000, "digital scales, measuring cups, and a pan with white residue from where crack had been cooked" at the residence. In the kitchen they also found baking soda, a black pan, a plastic cup, a measuring cup, a knife and bags with white residue, and a box of rubber gloves that appeared to have been used to cook crack cocaine.

Detective Fox said that, when officers arrested the Defendants, they recovered three cellular phones from the vehicle and one from the Grimes's person. Detective Fox did not remember whether Robinson claimed ownership of any of the cellular phones. He explained that cellular phones were indicia of resale because

> a lot of times [drug sellers] will have one line they talk to friends and family on and they will have other ones that are absent other people's names or Cricket phones with made up names or drop phones is what they call it and do all of their drug business and then drop it after a short time and get a new phone just in case someone has wire tape or whatever else on the phone.

5

Detective Fox further explained that "baggies" are considered indicia of resale because drugs are placed in them and sold to multiple people. Rubber gloves are often used to prevent contact with the drug base in case of drug testing.

Detective Fox stated that he did not find any clothes identified as belonging to Collier, and the only indication that he resided at the home were his own statements. Detective Fox further stated that, through his investigation, he discovered that Larry Collier, Collier's uncle whose documents were at the home, had died.

During further cross-examination, Detective Fox testified that the phone number that he and the confidential informant called belonged to Grimes, and they never called Robinson. He said that, although he heard Robinson's voice in the background while the confidential informant spoke to Grimes, he could not understand anything that the Defendant had said. Neither Detective Fox nor the confidential informant spoke directly with Robinson. When asked whether in his experience there was "ever a time when there were co[-]defendants that may have just been associated with the . . . main person involved in [the] crimes," Detective Fox answered that most of the time the people associated with the main person have either conspired with the main person, facilitated that transaction, or done something related to the offense.

Detective Fox stated that police officers did not find any drugs or drug paraphernalia on Robinson; however, some officers observed him throwing away a one-gram bag of crack cocaine. He further stated that the majority of the crack was "in the middle console between Grimes's and Robinson's feet . . . and in the floor too." Robinson did not have any money on his person when the officers searched him.

Detective Fox confirmed that a flex officer supervised Robinson and Collier while he placed recording equipment in the patrol car. He was unaware of whether the flex officer tried to "make a deal" with them. When asked why Robinson said that officers wanted him "to set somebody up," Detective Fox answered, "I guess one of the detectives came to him and asked him to set someone up to help himself out." Detective Fox said that whenever they arrest someone, they normally "give them an opportunity to help themselves out." Detective Fox could not definitively say whether Robinson's comment regarding fifteen stacks was in reference to an offer that a police officer made to him.

6

Detective Fox testified that he was not trained to dust for fingerprints and would have had to call for another unit to take fingerprints. He said that they did not take fingerprints at this crime scene. He agreed that, because they did not take fingerprints from the drugs, there was no evidence that Robinson had touched any of the evidence. Detective Fox stated that the drugs were in a clothing basket that was on the floor, and the paraphernalia was "just sitting out." He later clarified that police officers found the plastic bags with residue, the rubber gloves, and the two boxes of baking soda in a kitchen cabinet. The police officers did not find any documents or clothing that tied Robinson to the home. Detective Fox testified that he did not believe that Robinson lived at 2802 McCampbell Avenue, but "drug dealers tend to disassociate themselves from their store houses or there [sic] cook houses, where they cook up the crack[.]"

Detective Fox testified that he did not obtain a search warrant to search the home because Grimes gave him a key to the home and consented to the search. He said that Grimes initially denied coming from the home until the officers told him that they had observed him at the home. When asked whether they should have fingerprinted the drugs in the exercise of prudence, Detective Fox replied, "A lot of things could have been done and maybe a lot of things could not have been done."

During the recorded conversation between Robinson and Collier, Robinson spoke about someone "trying to flip him." When asked on cross examination if he tried to "turn this [Defendant]," Detective Fox said that he did not attempt to "flip" Robinson and did not know anything about another officer trying to "flip" him. Detective Fox said that he interpreted part of the transcript where Robinson stated,

> "Hell no. They want to try to use me because they know I know the n----s.
> They know I am the one, you know, what I am saying? I got the plug.
> They know this. They might have heard me say that I know the n----s in the
> Jamaca . . . . ."

as Robinson suggesting that he was a plug, which meant the person responsible for obtaining the drugs. Detective Fox stated that he did not investigate whether anyone else "had a nexus of ownership of [the] drugs" because the Defendants "were the only ones that had physical control of being around [the] drugs[.]" Finally, Detective Fox stated that the police are not required to record anything, but they may record a transaction to strengthen their case

Sergeant Curtis Watkins, a Metropolitan Nashville Police Department officer, testified that he was working in the West Crime Suppression Unit on December 8, 2006. He stated that Detective Fox directed him to go to the McCampbell Avenue residence to conduct surveillance of a black pickup truck. He was to wait outside until someone left the residence. Sergeant Watkins waited across the street from the residence in an unmarked car. He saw Grimes get into the driver's side of the pickup truck and the Robinson and Collier get into the passenger side. Sergeant Watkins followed the truck for a short period until Detective Fox advised him to return to the residence. When he returned to the residence, Sergeant Watkins did not see any people or cars other than those of the police officers.

On cross-examination, Sergeant Watkins testified that he did not have any personal knowledge about who lived at 2802 McCampbell Avenue. Sergeant Watkins identified a map of the area around 2802 McCampbell Avenue and pointed out the residence, the driveway to the home, where he had parked, and where Grimes's truck was parked. He said that he saw the three Defendants walk out of the residence. He did not see anyone carrying anything to the car. Sergeant Watkins testified that there were approximately two minutes when police officers did not watch the residence, and he could not say with certainty whether anyone entered the residence during that time.

Officer Joseph Simonik, a Metropolitan Nashville Police Department officer, testified that he was a member of the West Crime Suppression unit and assisted with the investigation of the Defendants. He said that Detective Fox had arranged an operation to investigate Grimes on December 8, 2006. He stated that he first observed the Defendants at Back Yard Burgers while police officers were removing them from their vehicle. Officer Simonik spoke with Grimes after police officers arrested him and searched 2802 McCampbell Avenue. According to Officer Simonik, Grimes claimed only the $1,000 that the police officers found inside the residence belonged to him.

Officer Simonik identified a photograph of clothing that police officers took at the residence. He said the photograph was significant because the clothes were extra large, corresponding with the Grimes's build. Officer Simonik did not recall in which room police officers found the clothing. He stated that police officers recovered three cellular phones from the vehicle and one from Grimes's person.

On cross-examination, Officer Simonik testified that, to his knowledge, police officers did not lift any fingerprints from the digital scales found in the kitchen. He

further stated that nothing in the home suggested that Robinson resided at 2802 McCampbell Avenue.

Officer Simonik stated that he gave the Defendants their *Miranda* warnings "almost immediately when they were taken into custody." He did not question Robinson and did not recall Robinson making any statements while Officer Simonik gave him *Miranda* warnings. Officer Simonik said that, because he arrived as police officers were arresting Robinson, he did not see Robinson dispose of any drugs.

Johnnie Melzoni, a Metropolitan Nashville Police Department officer, testified that he was a member of the West Crime Suppression Unit and investigated the Defendants alongside Detectives Fox and Watkins. He said that he was a support officer for Detective Fox. He was "one of the takedown units" and, as such, he waited for the order to stop the vehicle in which the Defendants rode. After receiving the order from the unit's supervisor, the police officers effected a stop and placed the Defendants in custody. Officer Melzoni testified that Grimes drove the vehicle, Robinson sat in the front passenger seat, and Collier sat in the back seat behind the passenger seat. He said that when he attempted to stop the vehicle, they fled and side swiped a car parked in the parking lot.

After taking the Defendants into custody, Officer Melzoni secured the vehicle and searched it. He stated that he found a blue bag that contained two smaller bags. One of the smaller bags contained approximately 105.7 grams of crack cocaine, and the other bag contained approximately 51.7 grams of powder cocaine. The blue bag was on the front floorboard between the driver and passenger sides. Officer Melzoni also saw a bag of crack cocaine that Robinson dropped after the police stopped him and a bag of marijuana in the vehicle's console.

Officer Melzoni said that he first saw the Defendants when they attempted to flee from the police and said he wrote it in the police report as "suspect vehicle rammed a parked vehicle and was stopped." He stated that the officers did not look for fingerprints on the drugs, and the only thing that connected Collier to the drugs was that he was in the car delivering them to the location.

Officer Melzoni saw the black truck involved in this case pull into the Back Yard Burgers parking lot. He then saw the truck circle the restaurant twice. He said that the truck "side-swiped a parked car[] as the parked car was sitting . . . outside the drive-through window." He could see the people who occupied the truck, but he could not see anything further. He did not know the location of the drugs inside the truck before the collision.

9

On redirect examination, Officer Melzoni identified a photograph that showed the black Ford F-150 truck wedged against a parked vehicle. He said that, when the truck side swiped the other vehicle, it was not a violent collision, and the accident did not cause the airbags in the vehicles to deploy.

Detective Scott Cothron, a Metropolitan Nashville Police Department officer, stated that he was working with the West Sector Crime Suppression Unit on December 8, 2006, and was involved in the undercover investigation of the Defendants. Detective Cothron participated in the search of both the vehicle and the house. From the vehicle, he identified a 5.3 gram bag of a white "rocklike" substance that he found underneath the middle of the front seat of the truck. From the residence, he recovered a pipe with residue in it and $1,000 from the second bedroom in the home.

On cross-examination, Detective Cothron testified that he did not know whether officers lifted fingerprints from the bag of white "rocklike" substance, the money, or the pipe; and he was unaware of anything connecting Robinson or Collier to those items.

Detective Ron Perkins, a Metropolitan Nashville Police Department officer working with the West Crime Suppression Unit, testified about his involvement in the investigation of the Defendants. Detective Perkins said that he assisted in the takedown of the Defendants. He stated that he was in a nearby bank parking lot, facing the passenger side of Grimes's truck while the takedown was in progress at the Back Yard Burgers. When he arrived, he assisted the crime suppression unit with "whatever [it] needed." He also went to the 2802 McCampbell Avenue. Detective Perkins searched the residence and found a plastic bag in a laundry hamper, which contained four smaller plastic bags. He said that three of the smaller bags contained a white rock substance and one contained plastic baggies.

On cross-examination, Detective Perkins stated that the vehicles were already stopped when he arrived at the scene, and he "did not observe the ramming of any vehicle." He said that if his report contained anything about Grimes's pickup truck ramming another vehicle, he had heard it from someone else.

Detective Perkins further testified that, to his knowledge, they did not take fingerprints at the residence and nothing connected Robinson to the residence or the bags of white rock substance. He stated that clothes were in the laundry basket in which police officers found the plastic bags. He could not remember whether the clothes covered the bags.

John Scott, Jr., a TBI Special Agent Forensic Scientist, testified as an expert in forensic science. He stated that on December 14, 2006, the Metropolitan Nashville Police Department provided him three exhibits on his first report relating to this case. He explained that he separated exhibits based on physical appearance, because one was a white powder substance, one was a rocklike substance, and one was a green plant material. Agent Scott testified the first exhibit was cocaine weighing 51.2 grams. He said that the second exhibit was 101.3 grams of cocaine base substance, and the third exhibit was 8.6 grams of marijuana. His second report covered two different exhibits that the Metropolitan Nashville Police Department provided him. The first was 11.4 grams of powder-like cocaine substance, and the second was 282.1 grams of a rock-like cocaine substance. Agent Scott stated that there was a rock-like substance that he did not test because its weight was not significant enough to satisfy the TBI's testing criteria.

On cross-examination, Agent Scott testified that the rock-like substance that he did not analyze weighed 7.3 grams. He stated that he did not analyze it because the TBI had a 300-gram criteria: in order for substances to be analyzed, it must weigh over 26 grams and less than 300 grams. He explained that because 7.3 grams does not meet the weight criteria, he did not analyze it. He stated that he could not tell the jury the composition of the 7.3 grams of white rock-like substance, but he said that it "had the same appearance as the other rock-like substance and that is why [he] grouped it together[.]"

Agent Scott stated that his lab report listed a substance that weighed 4.1 grams with packaging that he did not test personally. This substance was the package that police officers observed Robinson drop. He further stated that there was another unanalyzed white powder substance that he estimated weighed around one gram.

Agent Scott testified that, besides infrared spectrophotometry, he also used chromatography-mass spectrometry to test the substances. He used two tests because he needed two positive results to make a positive identification. He clarified that when he tested the 51.2 gram sample, he did not test all 51.2 grams but rather "just tore off a little small aliquot" for each of the two tests. Agent Scott said that the substance "appeared uniform like a cake mix" and, in his professional opinion, all 51.2 grams contained cocaine.

On redirect examination, Agent Scott explained that besides the 26 and 300 gram "cut-off weights" for testing controlled substances, there was also a .5 gram cut off weight. He further explained that the cut-off weights reflected how the law differentiated

various amounts of Schedule II controlled substances. He stated that, based on his experience, nothing about the unanalyzed substances ruled out the possibility that they were cocaine-based substances.

After hearing the evidence, the jury convicted Robinson of possession of more than 300 grams of cocaine with intent to sell and possession of drug paraphernalia. The trial court sentenced the Defendant to a seventeen-year sentence for the cocaine offense and a concurrent eleven-month and twenty-nine-days sentence for the drug paraphernalia offense. The jury convicted Grimes of possession of more than 300 grams of cocaine with intent to sell, possession of marijuana, and possession of drug paraphernalia. The trial court sentenced Grimes to thirty years as a multiple offender for the cocaine offense and to eleven months and twenty-nine days for each misdemeanor offense, ordering all of the sentences to be served concurrently. The Defendants timely appealed to this Court.

## II. Analysis

### A. Defendant Robinson

On appeal, Defendant Robinson argues that (1) the trial court erred when it allowed the State to introduce the redacted tape recording and transcript of statements he made during his arrest; (2) the trial court erred when it denied his motion for judgment of acquittal; and (3) the evidence was insufficient to support his convictions.

### 1. Admissibility of Evidence

The Defendant filed a pretrial motion in limine to prohibit the State from introducing a recorded conversation between himself and Grimes. The trial court granted the Defendant's motion in limine. During the trial, the State played a redacted version of the tape recording for the jury and gave the jury a redacted transcript of the recording. Defense counsel contemporaneously objected to the State's playing of the recording and use of the written transcripts; however, the trial court overruled the objection.

The Defendant alleges that the admission of the tape recording, even as redacted, was "inadmissible and unreliable evidence" in violation of Rule 402 of the Tennessee Rules of Evidence. The Defendant further alleges that the State "created an inadmissable, unreliable redacted transcript of such recording, that was, if anything, speculative in nature and confusing as well as misleading to the jury." The Defendant complains that the recording and transcript were prejudicial and violated his Fifth and Fourteenth United

12

States Constitutional due process rights to a fair trial and Tennessee Rule of Evidence 403.

In Tennessee, "trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion." *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996). Thus, it is within the trial court's discretion to determine whether to admit evidence of a tape or transcript of the tape, and that discretion will not be disturbed absent abuse. *See State v. Elrod*, 721 S.W.2d 820, 823 (Tenn. Crim. App. 1986). "[T]he tape recordings and compared transcripts are admissible and may be presented in evidence by any witness who was present during their recording or who monitored the conversations, if he was so situated and circumstanced that he was in a position to identify the declarant with certainty, and provided his testimony in whole, or in part, comports with the other rules of evidence." *State v. Reed*, 845 S.W.2d 234, 238 (Tenn. Crim. App. 1992) (quoting *State v. Coker*, 746 S.W.2d 167 (Tenn. 1987)).

The Defendant attacks the admissibility of the tape because the State redacted the tape, and portions of it were unintelligible. He argues that, because parts of the tape were redacted and garbled, it was impossible for the jury to weigh the full context of the conversation in a fair manner; therefore, the entire tape was inadmissible. We disagree. If a witness has properly authenticated a tape recording, the incompleteness of it goes only to its weight and not to its admissibility. *State v. Lee*, 618 S.W.2d 320 (Tenn. Crim. App. 1981) *abrogated on other grounds by State v. Charles Stanley Sissom*, No. 03C01-9106-CR-00168, 1992 WL 113379, at *2 (Tenn. Crim. App., at Knoxville, May 29, 1992); *Aldridge v. State*, 562 S.W.2d 216 (Tenn. Crim. App. 1977). Detective Fox properly authenticated the tape in this case. Thus, we find no error with respect to either complaint that the Defendant raises about the admission of this tape recording into evidence. The Defendant is not entitled to relief as to this issue.

Regarding the introduction of the transcript, the Defendant argues that the introduction of the redacted transcript created by the State "from the unreliable, redacted tape recording made during the arrest of [the Defendant] . . . is untrustworthy and inadmissable, thus making the redacted transcript as a whole, untrustworthy and inadmissible." It is well-settled in Tennessee that a transcript of a tape may be given to a jury where the jury is instructed that the tape, and not the transcript, is the actual evidence. *State v. Mosher*, 755 S.W.2d 464, 469 (Tenn. Crim. App. 1988); *State v. Smith*, 656 S.W.2d 882, 888 (Tenn. Crim. App. 1983). In the present case, the trial court properly advised the jury that the "transcript is not the evidence. The evidence is the tape, the recording itself," and we find no error in the trial court's instruction. Accordingly, we conclude that the trial court did not err in admitting the tape recording and allowing the jury to use the transcript. The Defendant is not entitled to relief as to this issue.

13

**2. Motion for Judgment of Acquittal and Sufficiency of the Evidence**

The Defendant next argues that the trial court erred in denying his motion for judgment of acquittal because the State based the case purely on circumstantial evidence. He asserts that the evidence was insufficient to convict him of possession of more than 300 grams of cocaine with intent to sell and possession of drug paraphernalia. Because these issues all concern the sufficiency of the convicting evidence, we address them together.

In Tennessee, "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978) *(*quoting *State v. Grace*, 493 S.W.2d 474, 472 (Tenn.1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 219 Tenn. 4, 405 S.W.2d 768, 771 (Tenn.1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (Tenn.1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *State v. Smith*, 24 S.W.3d 274, 279 (Tenn.2000). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans,* 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this Court why the evidence will not support the jury's verdict. *State v. Carruthers,* 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans,* 108 S.W.3d 231, 236 (Tenn. 2003); *see also* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. *State v. Harris,* 839 S.W.2d 54, 75 (Tenn. 1992). Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland,* 958 S.W.2d 651, 659

14

(Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice,* 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid,* 91 S.W.3d 247, 277 (Tenn. 2002).

A defendant may be convicted on the basis of direct or circumstantial evidence or a combination of both. *State v. Winters,* 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003); *see also State v. Pendergrass,* 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In fact, circumstantial evidence alone may be sufficient to support a conviction. *State v. Tharpe,* 726 S.W.2d 896, 899-900 (Tenn. 1987). Moreover, the State does not have the duty to exclude every other hypothesis except that of guilt. *See State v. Dorantes*, 331 S.W.3d 370,381 (Tenn. 2011) (adopting the United States Supreme Court standard that the jury is only required to weigh evidence, whether direct or circumstantial, against the reasonable doubt standard); *see also State v. James*, 315 S.W.3d 440, 455 n. 14 (Tenn. 2010) (noting that federal courts have rejected the notion that the government has a duty to exclude every other hypothesis save that of the defendant's guilt). "Circumstantial evidence in this respect is intrinsically no different from testimonial evidence." *Holland v. United States*, 348 U.S. 121, 140 (1954). Therefore, when considering the sufficiency of evidence, we treat direct and circumstantial evidence the same.

In the present case, to sustain the conviction for possession of drug paraphernalia, the State had to prove that the Defendant possessed drug paraphernalia with the intent to use it to "plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance[.]" T.C.A. § 39-17-425 (2010). To sustain the Defendant's conviction for possession of more than 300 grams of cocaine with intent to sell, the State had to prove that the Defendant knowingly possessed the cocaine with the intent to sell it. *See* T.C.A. § 39-17-417 (2010).

"'[P]ossession' may be either actual or constructive" and may be proven by circumstantial evidence. *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (citing *State v. Patterson*, 966 S.W.2d 435, 444-45 (Tenn. Crim. App. 1997); *State v. Brown*, 915 S.W.2d 3, 7 (Tenn. Crim. App. 1995)); *see also State v. Bigsby,* 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000). Constructive possession requires proof that a person had the power and intention at a given time to exercise dominion and control over the drugs either directly or through others. *Shaw*, 37 S.W.3d at 903 (citing *Patterson*, 966 S.W.2d at 444 (Tenn. Crim. App. 1997)). In essence, "constructive possession is the ability to reduce an object to actual possession." *State v. Ross*, 49 S.W.3d 833, 845-46 (Tenn. 2001) (citations omitted).

15

A jury may infer the intention to sell or deliver drugs from the amount of the drug possessed by the accused along with other relevant facts surrounding the arrest. *See* T.C.A. § 39-17-419 (2010); *see also State v. John Fitzgerald Belew*, W2004-01456-CCA-R3-CD, 2005 WL 885106, at *5 (Tenn. Crim. App., at Jackson, Apr. 18, 2005) (noting that the jury can infer intent to sell or deliver when amount of controlled substance and other relevant facts surrounding arrest are considered together). The amount of the drugs and the manner in which it was packaged may also support an inference of intent to sell. *See Brown*, 915 S.W.2d at 8.

In the case under submission, the evidence presented at trial proved that the majority of the crack recovered was located in close proximity to the Defendant. Officer Melzoni testified that the Defendant sat in the front passenger seat of the vehicle when police officers apprehended him and the Co-Defendants. After taking the Defendants into custody, Officer Melzoni secured the vehicle and searched it. Officer Melzoni found a blue bag that contained two smaller bags on the front floorboard between the driver and passenger sides. One of the smaller bags contained approximately 105.7 grams of crack cocaine, and the other bag contained approximately 51.7 grams of powder cocaine. Police also observed the Defendant drop a bag of crack cocaine after police stopped him.

As stated above, a jury may infer the intention to sell or deliver drugs from the amount of the drug possessed by the accused along with other relevant facts surrounding the arrest. *See* T.C.A. § 39-17-419 (2010). Further, the Defendant's constructive possession of the drugs is sufficient to sustain the conviction, which requires proof that the Defendant had the power and intention at a given time to exercise dominion and control over the drugs. *See Shaw*, 37 S.W.3d at 903. As proven in this case, the Defendant's position in the front passenger seat of the vehicle placed him in a position where he could exercise dominion and control over the drugs found in the console and front floorboard. The jury heard and weighed the testimony of witnesses and convicted the Defendant of possession of cocaine with intent to sell and possession of drug paraphernalia. Based on the evidence presented, we will not disturb the jury's finding on appeal. The evidence is sufficient to support the Defendant's convictions, and he is not entitled to relief on this issue.

### B. Defendant Grimes

The Defendant Grimes argues that trial court erred when it: (1) improperly admitted evidence about the weight of the cocaine; (2) denied his motion for disclosure of the confidential informant's basis of credibility and reliability; and (3) admitted a transcript of a conversation between him and the confidential informant into evidence.

16

### 1. Admission of Evidence

The Defendant contends that the trial court abused its discretion when it allowed "a speculative and arbitrary field test to determine that the amount of drugs was over 300 grams." According to the Defendant, the expert used the same quantity to test 300 grams of drugs as he did to test 7 grams of drugs, which was not representative of the amounts contained in each cache. The Defendant asserts that the expert's basis for limiting the amount of drugs that he tested was unscientific and arbitrary.

The admissibility of evidence is a matter committed to the sound discretion of the trial court and will not be overturned on appeal without a clear showing of abuse of that discretion. *State v. Porterfield*, 746 S.W.2d 441*,* 450 (Tenn. 1988). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is generally admissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of delay, waste of time, or needless presentation of cumulative evidence. Tenn. R. Evid. 403.

In the present case, Agent Scott, an expert in forensic science, testified that he used the same size sample to test the 300 grams and 51.2 grams of cocaine. During cross-examination, he explained that he used the same size sample for each amount because the substances looked uniform throughout. The expert witness's testimony about sample sizes used for testing did not make the testimony irrelevant, but rather went to the weight and credibility of the expert's testimony and was a factor for the jury to consider. Accordingly, we find the trial court did not abuse its discretion in admitting the expert witnesses's testimony regarding the weight of the drugs. The Defendant is not entitled to relief as to this issue.

### 2. Motion for Disclosure

The Defendant asserts that the trial court erred by refusing to order the State to disclose the identity of a confidential informant. Specifically, the Defendant contends that the disclosure was material to his defense. The Defendant argues that the trial court denied him "the opportunity to confront the [c]onfidential informant to gauge her credibility, reliability, and truthfulness."

We review the trial court's decision regarding the disclosure of a confidential informant for an abuse of discretion. *See State v. Ostein*, 293 S.W.3d 519, 526 (Tenn. 2009). The State is generally not required to disclose the identity of confidential informants except when the informant (1) participated in the crime, (2) witnessed the crime, or (3) "has knowledge which is favorable to the defendant." *Id*. (citing *State v. Vanderford*, 980 S.W.3d 290, 397 (Tenn. Crim. App. 1997)). The trial court's decision is dependent on the peculiar circumstances of each case. *See Vanderford*, 980 S.W.3d at 396. The defendant must show by a preponderance of the evidence the circumstances that entitle him to the confidential informant's identity. *Ostein*, 293 S.W.3d at 528.

In the present case, the Defendant filed a motion to compel disclosure of pertinent facts relating to the confidential informant's history of cooperation with police. In his brief, the Defendant merely asserts that the trial court's denial of the motion to divulge the confidential informant's identity prevented him from assessing the informant's history of cooperation with the police, including other cases and dates of cooperation involving [the Defendant.]" The Defendant relies on *State v. Jacumin,* 778 S.W.2d 430, 437 (Tenn. 1989), to support his argument that the trial court should have allowed him to scrutinize the confidential informant's credibility. However, in *Jacumin* our Supreme Court analyzed the informant's credibility as to probable cause for the issuance of a search warrant. *Id*. at 436-437. The record does not show that police officers sought or issued a warrant in this case. Furthermore, the Defendant does not argue that no probable cause existed for his arrest or any subsequent search. Likewise, the Defendant does not explain or offer any argument about how knowledge of the confidential informant's previous cooperation would have been helpful to his defense or was essential to a fair determination of the trial. *See State v. Taylor*, 763 S.W.2d 756, 760 (Tenn. Crim. App. 1988). Thus, we conclude that the trial court did not abuse its discretion. The Defendant is not entitled to relief as to this issue.

### 3. Introduction of Tape Recording

The Defendant argues that because the audio quality of the tape was "so poor," he was "severely prejudiced when the State was allowed to admit into evidence a contrived transcript or a conversation, allegedly had between the [Defendant] and the [c]onfidential [i]nformant." The Defendant argues that the transcript was speculative and the trial court should not have allowed the jury to use it. He asserts that both the recording and transcript are unreliable.

As we earlier stated, " trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that

discretion." *McLeod*, 937 S.W.2d at 871. Thus, it is within the trial court's discretion to decide whether to admit evidence of a tape or transcript of the tape, and that discretion will not be disturbed absent abuse. *See Elrod*, 721 S.W.2d at 823. "[T]he tape recordings and compared transcripts are admissible and may be presented in evidence by any witness who was present during their recording or who monitored the conversations, if he was so situated and circumstanced that he was in a position to identify the declarant with certainty, and provided his testimony in whole, or in part, comports with the other rules of evidence." *Reed*, 845 S.W.2d at 238 (quoting *Coker*, 746 S.W.2d at 167).

Just as we concluded above, regarding introduction of the conversation between Robinson and Collier, we conclude that the trial court did not err in admitting the tape recording of Grimes and the confidential informant and allowing the jury to use the transcript. Again, the incompleteness of the evidence goes only to its weight and not to its admissibility. *Lee*, 618 S.W.2d at 320; *Aldridge,* 562 S.W.2d at 216. Detective Fox properly authenticated the tape in this case. Thus, we find no error with respect to either complaint that the Defendant raises about the admission of the recording. Moreover, it is well-settled in Tennessee that a transcript of a tape may be given to a jury where the court instructs the jury that the tape, and not the transcript is the actual evidence. *Mosher*, 755 S.W.2d at469; *Smith*, 656 S.W.2d at 888. The trial court properly advised the jury that the transcript was not the evidence, and the evidence was the recording itself. We find no error in the trial court's instruction or admittance of the recording and transcript. The Defendant is not entitled to relief on this issue.

### III. Conclusion

Based on the foregoing and the record as a whole, we affirm Robinson's convictions for possession of more than 300 grams of cocaine with intent to sell and possession of drug paraphernalia; and we affirm Grimes's convictions for possession of more than 300 grams of cocaine with intent to sell, possession of marijuana, and possession of drug paraphernalia.

_____
ROBERT W. WEDEMEYER, JUDGE